ARTHUR S. DEMOULAS *vs.* DEMOULAS SUPER MARKETS, INC.,
& others.[1]

Middlesex. November 6, 1996. - March 13, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, & MARSHALL, JJ.

*Practice, Civil,* Findings by judge, Standing, Bias of judge, Jury trial,
Contempt. *Conflict of Laws. Corporation,* Stockholder's derivative suit,
Voting trust, Corporate opportunity, Close corporation, Director's li-
ability, Officers and agents, Liability of officers, Indemnification of offic-
ers and directors. *Trust,* Voting trust, Beneficiary, Breach of trust,
Constructive trust. *Fiduciary. Limitations, Statute of. Judge. Bona Fide
Purchaser. Uniform Commercial Code,* Good faith, Notice. *Damages,*
Interest, Attorney's fees. *Contempt. Injunction. Laches.*

A prohibition of shareholder derivative actions against two corporations,
their officers and directors, as set forth in a voting trust agreement, was
unenforceable as against public policy and contrary to general principles
of trust law. [514-516]
The judge in a shareholder derivative action correctly concluded that the
plaintiff had standing to maintain the action as beneficial owner of
shares in a family trust and the plaintiff was not bound by the trustee's
failure to bring such an action. [516-517]
The three-year tort statute of limitations set forth in G. L. c. 260, § 2A,
did not bar a shareholder's derivative action, where the doctrine of
fraudulent concealment, as set forth in G. L. c. 260, § 12, and the
repudiation of trust doctrine were applicable to the breaches of fiduciary
duty that the defendants concealed from the knowledge of the plaintiff;
the judge did not err in concluding that the statute of limitations was
tolled for the period prior to the plaintiff's actual discovery of the cause
of action. [517-522]
Where two corporations were the injured parties in a shareholder's deriva-
tive suit, the judge did not err in concluding that the three-year tort
statute of limitations was tolled while the defendants had complete and
exclusive control ("adverse domination") of the two corporate boards.
[522-524]
There was no merit to defendants' assertions on appeal from a judgment in
a shareholder's derivative action that the trial judge was not impartial.
[524-526]

---

[1]Valley Properties, Inc.; Market Basket, Inc.; Doric Development Corp.;
Lee Drug, Inc.; and D. Harold Sullivan, Telemachus A. Demoulas, Irene
Demoulas, Arthur T. Demoulas, Frances D. Kettenbach, Glorianne D.
Farnham, and Caren D. Pasquale, individually and, where applicable, as
general partners of 231 Realty Associates.

The judge in a shareholder's derivative action correctly denied the defendants' demand for a jury trial, where the action was grounded on a breach of trust and sought primarily equitable relief; this court declined to adopt the Federal practice described in *Ross* v. *Bernhard,* 396 U.S. 531, 532-533 (1970). [526-527]

Discussion of the nature and scope of the corporate opportunity doctrine. [528-533]

The judge in a shareholder's derivative action brought on behalf of two corporations against the officers and directors correctly concluded that the defendants participated in, or benefited from, improper diversions of corporate opportunities and self-dealing transactions, to the detriment of the two corporations [528, 533-543]; further, the judge did not err in ordering as a remedy that the culpable defendants must return the benefits they had received as a result of their breaches of fiduciary duty or other wrongful acts [543-546].

In a shareholder's derivative action, the judge correctly concluded that certain defendants, shareholders in two corporations, were not bona fide purchasers for value of their stock and partnership interests, where the defendants did not carry their burden of proof on the issue: the judge correctly imposed a constructive trust on those assets on behalf of the two corporations [546-555].

In a shareholder's derivative action, the judge correctly based the remedies for the defendants' wrongs on the principle of preventing unjust enrichment and appropriately sought to achieve restitution by rescission of the improper transactions and disgorgement of the wrongful gains [555-557]; however, to ensure that the defendants were not being required to repay more than their actual gains, the matter was remanded for a determination of the amount of the defendants' original investment and tax deductions for which they should receive credit [557-559].

In a shareholder's derivative action, the judge correctly ordered the defendants to pay interest at the rate of six percent on cash distributions they had wrongfully received from two corporations. [559]

In a shareholder's derivative action, where the by-laws of the two corporations at issue provided for the indemnification of officers and directors for expenses incurred in any litigation to which they were made parties by reason of their offices and where a director was not adjudicated to have acted in bad faith with respect to certain transactions, the judge incorrectly ordered that director to repay his legal expenses [560-562]; where no substantive claim of misconduct against that director was alleged and he was not one of the defendants against whom judgment entered, he was not a proper party and should have been dismissed form the case [562-563].

In a civil contempt action, the injunctive order in the underlying shareholder's derivative suit prohibiting the defendants from transferring assets "except in the ordinary course of business" was not so ambiguous a command as to be incapable of being enforced through a contempt order [563-567], and the defendants' attempt to pay out during a ten-week period three years' worth of undistributed corporate earnings amounting to over $68 million was clearly and undoubtedly in disobedience of the injunction, which was clearly designed to preserve assets [567-570].

A contempt action was not barred by laches where the plaintiff commenced

the action within a reasonable time after the cause of action accrued and where the defendant demonstrated no prejudice or disadvantage thereby. [570]

In a civil contempt proceeding the judge appropriately and properly awarded the plaintiff who prevailed attorney's fees and costs. [570-571]

CIVIL ACTION commenced in the Superior Court Department on April 30, 1990.

The case was heard by *Maria I. Lopez, J.*

A complaint for civil contempt, filed on January 20, 1993, was heard by *Robert H. Bohn, Jr, J.*

The Supreme Judicial Court granted an application for direct appellate review.

*Edward J. Barshak* for Telemachus A. Demoulas & others.

*Judith Gail Dein* for Glorianne D. Farnham & another.

*Gary C. Crossen* for Frances D. Kettenback.

*Robert C. Gerrard (Anthony R. Pelusi, Jr., Carol R. Cohen & Thomas S. Fitzpatrick* with him) for Arthur S. Demoulas.

*Jerome Gotkin, John Paul Sullivan, Peter A. Biagetti & A.W. Phinney, III,* for Demoulas Super Markets, Inc., submitted a brief.

*Thomas J. Dougherty, George J. Skelly & James R. Carroll* for D. Harold Sullivan, submitted a brief.

GREANEY, J. The plaintiff, Arthur S. Demoulas, commenced a shareholder derivative action on behalf of Demoulas Super Markets, Inc. (DSM), and Valley Properties, Inc. (Valley), against the defendants, alleging that the defendants had wrongfully, and in breach of fiduciary duties, usurped corporate opportunities that should have been presented to DSM and Valley. A Superior Court judge sitting without a jury presided over a complex, and at times contentious, trial lasting eighty-four days, at which numerous witnesses testified and over 900 exhibits were introduced. The judge entered a 217-page decision containing findings of fact and rulings of law in which she found the defendants individually and collectively responsible for wrongfully diverting corporate opportunities. The defendants appeal from the amended judgment. DSM has also appealed from a separate judgment of civil contempt entered after a trial by another judge in the Superior Court sitting without a jury. We granted the defendants' application for direct appellate review and heard

both appeals together. We agree with most of the judge's conclusions, but remand the case to the Superior Court for recomputation of the remedy to ensure a just recovery, and for the entry of orders dismissing the defendant D. Harold Sullivan from the case and removing the requirement that he reimburse DSM and Valley for funds received for attorney's fees and costs. We also affirm the civil contempt judgment against DSM, including its award of attorney's fees.

## I. INTRODUCTION.

The Demoulas supermarket chain had its origin in a neighborhood food store in Lowell that was opened in 1917 by Arthur and Efrasine Demoulas. In 1954, the couple sold their business to two of their six children, George and Telemachus. Over the next decade, the brothers opened four additional stores in northeastern Massachusetts. In 1964, they formed DSM, and merged into it the separate corporations they had previously established for each of their existing stores. DSM was wholly owned by George, Telemachus, and their spouses: George owned 300 shares; his wife, Evanthea, 200 shares; Telemachus, 300 shares; and Telemachus's wife, Irene, 200 shares. At the time of the merger, the two sides of the Demoulas family owned an equal number of shares in DSM. From 1964 through 1970, DSM grew into a chain of fourteen supermarkets by opening nine additional stores, including two in New Hampshire.[2]

George and Evanthea had four children: Fotene (born in 1954), Evan (1955), Diana (1956), and the plaintiff (1958). Telemachus and Irene also had four children: Frances (1950), Glorianne (1952), Arthur T. (1955), and Caren (1959).[3]

George died suddenly on June 27, 1971. At his death, Telemachus assumed control of DSM under the terms of a voting trust agreement (VTA) that had been entered into by DSM shareholders in 1965.[4] The VTA designated George and Telemachus as voting cotrustees and placed the shareholders'

[2]The judge's decision lists nine stores but states that eight additional stores were opened.

[3]Except for the plaintiff, we shall refer to these individuals by their first names.

[4]In 1967, following a five-for-one stock split, the shareholders signed a new voting trust agreement (VTA) to replace the original agreement. The terms of the two VTAs were "substantially similar."

voting powers in their hands. On George's death, Telemachus became the sole voting trustee of DSM. There was no provision in the VTA for the selection of a new cotrustee to succeed George. Telemachus also became the executor of George's estate and a trustee of testamentary trusts established on behalf of George's children by his will.

In 1990, the plaintiff brought this shareholder derivative action on behalf of DSM and Valley. The essence of the plaintiff's complaint is that, in the years since George's death, Telemachus and the members of his family have exploited Telemachus's control over DSM and Valley to transfer assets and divert business opportunities away from those corporations, which were jointly owned by George's and Telemachus's sides of the Demoulas family, into other businesses that were solely owned by Telemachus's branch. The defendants in this action include (in addition to DSM and Valley) Telemachus, his wife, his children, DSM's accountant (D. Harold Sullivan), and the companies that received these diverted assets and opportunities (Market Basket, Inc.; Doric Development Corporation, Inc.; and Lee Drug, Inc.).[5]

In a separate but related action, George's widow and children charged that Telemachus and his children also used wrongful means to gain a greater share of ownership in DSM itself, at the expense of the members of George's family.[6] In a trial of those claims, a jury found Telemachus (but not his children) liable for fraud, conversion, and breach of fiduciary duties with respect to estate and trust assets. The jury found that Telemachus's considerable transgressions involved the transfer, purchase, and redemption of stock belonging to Evanthea, George's estate, and their children. The result, over time, was to increase the proportion of DSM stock in the hands of Telemachus, his wife, and his children to ninety-two per cent. The same judge presided at both that trial (which we shall refer to as the "stock transfer action") and the shareholder derivative action that is now before us.

---

[5]Another benefiting company, 231 Realty Associates, was a partnership whose partnership consisted of Telemachus's four children. They are sued both individually and as general partners of 231 Realty.

[6]Rafaele L. Demoulas, administratrix, & others *vs.* Telemachus A. Demoulas & others, Middlesex Superior Court Civil Action 90-2344-B. The jury reached their verdicts on May 26, 1994. A comprehensive judgment entered on this case on February 26, 1997.

The plaintiff's claims in the shareholder derivative action involve the following types of business activity.

A. *Supermarkets.* Until 1986, New Hampshire law limited the number of licenses for retail beer and wine sales that could be held by one person or corporation, thereby hindering DSM's planned expansion in that State. To overcome these restrictions, two new corporations were formed, Seabrook Sales, Inc. (1973), and P&P Foods, Inc. (1978), and supermarkets were opened by those companies. Although DSM supplied financing, and DSM personnel managed these supermarkets, the companies were not owned by DSM. Seabrook Sales was owned by George and Telemachus's sister, Ann Burliss, and P&P Foods was owned by one of Telemachus's daughters, Frances. In 1981, Frances exercised an option and acquired Seabrook (which by that time had been renamed Market Basket); the two companies merged and became Market Basket, Inc. In 1986, Frances sold part of her stock to her siblings and her parents. The end result was the creation of a supermarket chain that was entirely owned by members of Telemachus's branch of the family. In the years that followed, more new supermarkets were opened under the Market Basket name, and in 1988, DSM sold seventeen of its own stores to Market Basket. The plaintiff contends that the creation and growth of Market Basket as a separate entity, the placement of its ownership solely in the hands of Telemachus and his family, and the transfer of stores from DSM to Market Basket damaged DSM through the diversion of corporate opportunities and assets, and that the individual defendants violated their fiduciary duties to DSM and benefited from their wrongful acts. The defendants deny that any of these acts was improper or gave rise to liability for benefits received from any alleged violations of their fiduciary duty to DSM.

B. *Drug stores.* Lee Drug, a chain of drug stores, was established in 1983. According to the defendants, the DSM board of directors had turned down a proposal presented by Telemachus's son, Arthur T., that DSM establish and own the chain and had authorized Arthur T. to pursue the opportunity on his own. The plaintiff contends that, even though the proposal was offered to DSM and rejected by it, this venture nonetheless is an usurped corporate opportunity, because the procedures followed during DSM's consideration

failed to meet the requirements of the corporate opportunity doctrine, and material facts were not disclosed to the DSM board. When it was first established, Lee Drug was owned by a corporation, Doric Distributors, Inc., whose sole shareholders were Telemachus's four children. In 1986, the two companies merged, and Arthur T. became the majority shareholder, with Frances, Caren, Glorianne, and Arthur T.'s wife, Maureen (see note 60, *infra*), owning the balance.[7]

C. *Real estate.* Prior to 1980, sites for shopping centers that were to contain Demoulas Super Market stores were acquired and developed by DSM Realty (a wholly owned subsidiary of DSM); by Delta & Delta Realty Trust, established in 1971 and owned by members of both branches of the Demoulas families, with Telemachus as sole trustee; and by Valley Properties, Inc. (Valley), which was incorporated in 1974 with Telemachus's and George's branches owning equal shares.[8] The shareholders entered into a VTA that named Telemachus as sole voting trustee of Valley. Beginning in 1980, additional real estate companies were established that were owned solely by members of Telemachus's family. These entities included Northland Properties, Inc. (incorporated in 1980, merged with Market Basket in December, 1986); Doric Development Corporation, Inc. (incorporated in 1981); and 231 Realty Associates (a partnership established in 1985). The defendants argue that these various companies fulfilled different development functions, and that transactions among them were fair to DSM and Valley. The plaintiff contends the new companies displaced the older ones in developing parcels at a profit, and that fully developed, or partially developed, properties were transferred from the old companies to the new ones at less than fair market value. The result, the plaintiff argues, was to build up the value of the companies wholly owned by members of Telemachus's family, to the detriment of the companies owned jointly by members of the Demoulas family's two branches.

The trial of the shareholder derivative action began in

[7]On September 7, 1990, Lee Drug was sold to Walgreen Eastern Company, Inc. The proceeds of that sale have been held in escrow pending the outcome of this action.

[8]The ownership of Valley will be described in more detail later in this opinion, in the discussion of the enforceability of the VTAs. As will be noted, some of the stock in Valley was owned by persons outside the two immediate families.

December, 1994, and concluded in May, 1995. The judge subsequently entered her decision, which contained 497 findings of fact and 154 rulings of law. Thereafter, an amended judgment entered, which contained orders in favor of the plaintiff against all of the individual defendants, and against Market Basket, Doric Development, and Lee Drug. The amended judgment ordered that:

(1) Market Basket and the individual defendants (including Sullivan) "effect the transfer of all of the assets and liabilities of Market Basket, Doric Development and 231 Realty" to DSM, with the exception of one real estate parcel (identified as "Stratham #26"), which was to be transferred to Valley;

(2) the proceeds from the sale of Lee Drug, being held in escrow, be paid to DSM;

(3) Telemachus, Irene, and their four children pay to DSM "all cash distributions received by them from Market Basket, Doric Development and 231 Realty";

(4) the same individuals and Market Basket "effect the cancellation of all promissory notes issued by Market Basket as distributions to shareholders" and deliver the cancelled notes to DSM;

(5) all the individual defendants, including Sullivan, pay to DSM and Valley any monies they had received from DSM, Valley, Market Basket, Lee Drug, Doric Development, and 231 Realty for legal and other expenses in defending this action; and

(6) DSM and Valley pay the plaintiff's costs and attorney's fees.

The amended judgment also imposed an interest charge of six per cent a year on the amounts of the cash distributions and the disbursements for legal expenses, to run from the date of the distributions and disbursements to the date of restitution. The defendants have raised numerous procedural and substantive issues in their appeal from the amended judgment.

There is also before us the judgment of civil contempt made in a separate proceeding,[9] arising from an alleged violation of a preliminary injunction by DSM that restricted the transfer

---

[9]As has been mentioned, the contempt proceedings were conducted in the Superior Court before a judge other than the one who presided at both the stock transfer action and the shareholder derivative action.

or distribution of certain assets during the pendency of the shareholder derivative action. In making his finding of contempt, the judge determined that cash distributions and payments against promissory notes issued to DSM shareholders were not made in the ordinary course of business and violated the terms of the injunction. The defendant DSM appeals from this determination, and from the resulting order that directs DSM to place assets in an escrow account equal to the amount of the distributions and payments and to pay the plaintiff's costs and attorney's fees incurred in the contempt action.[10]

## II. STANDARD OF REVIEW.

The shareholder derivative action was tried without a jury. As has been mentioned, the judge's detailed decision contains 497 findings of fact and 154 rulings of law. We do not set aside a judge's findings of fact unless they are "clearly erroneous." Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1974). A finding is "clearly erroneous" only when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 160 (1977), quoting *United States* v. *United States Gypsum Co.*, 333 U.S. 364, 395 (1948). See *Edinburg* v. *Edinburg*, 22 Mass. App. Ct. 199, 203-204 (1986), and cases cited. It is the appellant's burden to show that a finding of fact is clearly erroneous. *First Pa. Mtge. Trust* v. *Dorchester Sav. Bank*, 395 Mass. 614, 621-622 (1985). In applying the "clearly erroneous" standard, rule 52 (a) requires that "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." We recognize that the judge, who has a "firsthand view of the presen-

---

[10]The defendants also move for relief seeking a dismissal of the plaintiff's case on the basis of an allegation that the plaintiff has conspired fraudulently to affect the adjudication of this action. We deny the motion. As the basis for their motion, the defendants call our attention to ongoing litigation in the United States District Court for the District of Massachusetts, Kettenbach & others *vs.* Arthur S. Demoulas, Civil Action No. 92-10482-PBS. The Federal court's ruling to which the defendants call our attention amounts to no more than a preliminary determination that certain evidence should be admitted in a retrial of the action pending before that court. There has not been "adjudication" of conspiracy in that court that would affect the judicial process in the matter before us.

tation of evidence, is in the best position to judge the weight and credibility of the evidence." *New England Canteen Serv., Inc.* v. *Ashley,* 372 Mass. 671, 675 (1977). The judge's advantage in weighing the testimony is particularly evident in a case involving conflicting testimony, "one in which widely differing inferences could be drawn from the evidence," and the drawing of inferences cannot be separated from the evaluation of the testimony itself. *Goddard* v. *Dupree,* 322 Mass. 247, 248 (1948). As a consequence, we do not "review questions of fact found by the judge, where such findings are supported 'on any reasonable view of the evidence, including all rational inferences of which it was susceptible.' " *T.L. Edwards, Inc.* v. *Fields,* 371 Mass. 895, 896 (1976), quoting *Bowers* v. *Hathaway,* 337 Mass. 88, 89 (1958). So long as the judge's account is plausible in light of the entire record, an appellate court should decline to reverse it. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Gallagher* v. *Taylor,* 26 Mass. App. Ct. 876, 881 (1989), quoting *Anderson* v. *Bessemer,* 470 U.S. 564, 573-574 (1985).[11]

We are not bound, however, by the judge's conclusions of law, and we must ensure that the judge's ultimate findings and conclusions are consistent with relevant legal standards. *Simon* v. *Weymouth Agric. & Indus. Soc'y,* 389 Mass. 146, 148-149 (1983). Furthermore, "[i]nferences from the basic facts . . . are open for our decision . . . ." *Id.* at 148, quoting *Malone* v. *Walsh,* 315 Mass. 484, 490 (1944). If a judge's ultimate findings are inconsistent with the subsidiary findings, we must set them aside. *Simon, supra* at 148-149. However, when the judge's conclusions are based on reasonable inferences from the evidence and are consistent with the findings, there is usually no error. *Chapman* v. *University of Mass. Medical Ctr.,* 417 Mass. 104, 110-111 (1994), *S.C.,* 423 Mass. 584 (1996).

---

[11]The defendants argue that the judge's fact-finding process was tainted by her rejection of the credibility of many defense witnesses and her acceptance of the plaintiff's witnesses' testimony. The defendants suggest that we should be skeptical of the judge's factual findings and "delve into the facts." *Springgate* v. *School Comm. of Mattapoisett,* 11 Mass. App. Ct. 304, 311 (1981). However, *Springgate* is distinguishable from this action, and its "peculiar circumstances," *id.,* do not offer a basis for applying more stringent scrutiny here. Even in *Springgate,* the Appeals Court ultimately followed the "clearly erroneous" standard in concluding that the trial judge had erred in his findings of fact. *Id.* at 305-307, 309-310, 316.

This case also potentially raises a choice of law issue. DSM was initially formed as a Delaware corporation in 1964; in 1982, a new Massachusetts corporation was formed and the Delaware corporation was merged into it. Arguably, claims arising from occurrences while DSM was a Delaware corporation should be determined according to Delaware law.[12] We have, in the past, looked to the law of the State of incorporation to determine the liability of corporate directors for their acts. *Beacon Wool Corp.* v. *Johnson*, 331 Mass. 274, 279 (1954). More recently, we have favored a functional approach to resolving choice of law issues on the basis of a "significant relationship." See *New England Tel. & Tel. Co.* v. *Gourdeau Constr. Co.*, 419 Mass. 658, 659-660 (1995); *Bushkin Assocs.* v. *Raytheon Co.*, 393 Mass. 622 (1985). Whether or not the "State of incorporation" principle should continue to be followed generally in the choice of law for shareholder derivative suits (a matter we do not need to address here), the particular circumstances of this action favor applying Massachusetts law in determining all of the plaintiff's claims. Applying two different sets of State laws to the activities of a corporation whose existence was, for all practical purposes, continuous throughout the period, would be a cumbersome and unnecessarily formalistic exercise. None of the parties in this case has any relationship to Delaware beyond the mere fact of DSM's initial incorporation there, and all of the claims involve occurrences either in Massachusetts or New Hampshire, not Delaware. Therefore, we have resolved all of the issues in this action on the basis of Massachusetts law. See Restatement (Second) of Conflict of Laws § 309 & comment c (1971) (law of the State of incorporation is followed in determining corporate director liability, except where, on a "particular issue," another State has a more "significant relationship").[13]

With these considerations in mind, we now proceed to deal with the many issues raised on appeal.

[12]The plaintiff makes such an argument. The judge did not apply Delaware law, and the defendants do not address this issue.

[13]The formation of the new DSM corporation, and the merger of the first one into the new one, did not extinguish the plaintiff's right to bring a shareholder derivative suit for claims arising from occurrences during the first corporation's existence. See *Kessler* v. *Sinclair*, 37 Mass. App. Ct. 573, 575-579 (1994).

### III. PRELIMINARY ISSUES.

The defendants make several procedural arguments for overturning the judge's decision in its entirety. They assert that:

(1) the plaintiff is precluded from bringing a shareholder derivative action by provisions of the DSM and Valley VTAs;

(2) the statute of limitations bars any of the plaintiff's claims that arose prior to April 30, 1987 (three years before his filing of the shareholder derivative action), and none of the exceptions to the statute applies;

(3) the judge was biased against the defendants, and a new trial should be ordered on all claims that are not otherwise barred because of the alleged bias; and

(4) the defendants were denied their constitutional right to a jury trial.

For the reasons next discussed, we are unpersuaded by the defendants' arguments on these issues.

A. *Enforceability of anti-suit provisions in the voting trust agreements.* During the period covered by the claims in this action, both DSM and Valley were subject to VTAs entered into by their shareholders. The initial DSM VTA was signed on January 21, 1965, by the company's four shareholders: Telemachus, Irene, George, and Evanthea. In 1967, following a stock split, a second VTA replaced the first, without changing its terms. See note 4, *supra.* Under both agreements, George and Telemachus were named as voting cotrustees. On George's death in 1971, Telemachus became the sole voting trustee, as prescribed by the terms of the VTA. New VTAs were entered into in 1977 and in 1982. In each instance, all the DSM shareholders signed the VTA, giving Telemachus the power, as the sole voting trustee, to exercise all shareholder voting authority. As of 1982, the DSM shareholders included Telemachus, his wife Irene, three of their children (Arthur T., Glorianne, and Caren[14]), George's four children

---

[14]Their other child, Frances was a shareholder in 1977 and had signed the 1977 VTA. In 1978, Frances sold her stock to Arthur T. and as a result was no longer a shareholder in 1982.

(Arthur S., Evan, Diana, and Fotene), and two DSM employ-
ees (James Miamis and Julian Lacourse).[15]

Valley was incorporated in April, 1974. Its shareholders
included Telemachus, George's estate (of which Telemachus
and Evanthea were coexecutors), the children of George and
Telemachus as beneficiaries of two separate family trusts,
Costas Psoinos (Irene's brother), Antonios Katsikas (related
to Irene by marriage), and D. Harold Sullivan. In August,
1974, a voting trust was established for Valley. This agree-
ment was signed by Telemachus, Evanthea, Psoinos, Katsi-
kas, Sullivan, and Stephen J. Sotakos, who was trustee of
both the George A. Demoulas and Telemachus A. Demoulas
Family Trusts. The VTA named Telemachus as sole voting
trustee.

The 1977 and the 1982 VTAs for DSM, and the 1974 Val-
ley VTA, each contained provisions in art. VI that vested title
to the common stock in Telemachus as voting trustee and
provided that:

> "[T]he voting trustee shall . . . possess and be entitled
> to exercise all stockholders' rights of every kind, includ-
> ing the right to vote and to take part in or consent to
> any corporate or stockholders' action and to receive
> dividends on said stock. It is expressly understood and
> agreed that the holders of Voting Trust Certificates [16]
> shall not have any right, with respect to the stock held
> by the voting trustee, to vote, take any part in, com-
> mence or consent to any corporate or stockholders' ac-
> tion of or against the Corporation, its officers and Direc-
> tors."

The defendants contend that the language of art. VI bars
all the original shareholders in DSM or Valley (who now
hold voting trust certificates) from bringing a shareholder de-

---

[15]The trial judge found that Miamis and Lacourse purchased their stock
in 1977 through loans from Telemachus that they were never required to
repay. DSM redeemed Miamis's stock in 1986, for a payment of $ 1.19 mil-
lion spread over ten years. Lacourse sold his stock to Telemachus in the
mid-1980's for approximately $1.5 million. Miamis was a member of the
DSM board from 1964 until 1984, and Lacourse was a board member from
1971 until 1984.

[16]Under the terms of the VTAs, the shareholders assigned and transferred
their certificates of common stock to the voting trustee and in exchange
received "voting trust certificates."

rivative action against either of those corporations. The defendants further argue that the plaintiff lacks standing to bring such an action against Valley because his only interest in Valley was as a beneficiary of the George A. Demoulas Family Trust, and he is bound by contract to the terms of the VTA by the assent of the trustee Sotakos.

The judge rejected these arguments. The judge ruled that the prohibition of shareholder derivative actions in art. VI is unenforceable because public policy disfavors "exculpatory" provisions in trust agreements that bar a beneficiary from suing a trustee for certain violations of trust. Similarly, the judge decided that actions against corporate directors, who are considered trustees of their corporation, should for reasons of public policy not be barred. The judge also found that the plaintiff had standing to bring a shareholder derivative action on behalf of Valley, and that his rights to do so had not been waived by Sotakos's assent to the VTA. We agree with the judge's rulings and conclude that the plaintiff was not precluded from bringing shareholder derivative actions on behalf of DSM and Valley either by the language of art. VI or by the nature of his interest in Valley.[17]

1. *Enforceability of art. VI.* We have long held that a voting trust agreement is a legitimate device for carrying out such corporate purposes as centralized control of management, continuity of corporate policy, or representation of creditors' interests. See *Fogelin* v. *Nordblom,* 402 Mass. 218, 223 (1988); *Selig* v. *Wexler,* 355 Mass. 671, 679-680 (1969); *Massa* v. *Stone,* 346 Mass. 67, 74-75 (1963); *Sagalyn* v. *Meekins, Packard & Wheat Inc.,* 290 Mass. 434, 440 (1935). However, voting trust agreements are to be construed strictly, and will not be upheld if they are used in a manner adverse to the interests of the corporation or the participating shareholders, or where the trust is no longer operating in a manner that carries out its purpose. See *Massa, supra* at 74 (trustee appointed to conserve creditor's interests may not act to the detriment of corporation and beneficiaries); *Selig, supra* (trust terminated where partiality of trustees appointed to act as neutral direc-

---

[17]As we conclude that art. VI is unenforceable on these grounds, we do not address the judge's additional rulings that art. VI is an unenforceable release from liability for intentional harm and that, even if art. VI could be enforced, the DSM VTA was voidable in its entirety by the plaintiff, based on principles governing contracts between beneficiaries and fiduciaries.

tors frustrated trust's purpose). See also C.A. Peairs, Business Corporations § 444 (2d ed. 1971 & Supp. 1996).[18] Even if the DSM and Valley VTAs serve legitimate corporate purposes, the provisions in art. VI of each agreement that bar any shareholder derivative action, thereby offering a complete shield to corporate officers and directors for any wrongs that they commit against the corporation, are contrary to general principles of trust law and, as a consequence, are unenforceable.

Trust law applies to voting trust agreements and to the management of corporations. See *Selig, supra* at 679; *Seder* v. *Gibbs*, 333 Mass. 445, 452-453 (1956), quoting *Spiegel* v. *Beacon Participations, Inc.*, 297 Mass. 398, 410-411 (1937) (corporate directors have been called trustees and have a fiduciary relationship with the corporation). An exculpatory provision in a trust, which precludes a beneficiary from suing a trustee for a breach of trust, is clearly disfavored. *Marsman* v. *Nasca*, 30 Mass. App. Ct. 789, 799 (1991). Such a provision will not be enforced to relieve a trustee of liability for a breach of trust that is committed in bad faith, intentionally, or with reckless indifference to the interests of the beneficiary, or to relieve a trustee of liability for any profit that the trustee has derived from a breach of trust. See *Dill* v. *Boston Safe Deposit & Trust Co.*, 343 Mass. 97, 100 (1961); Restatement (Second) of Trusts § 222 (2) & comment b (1959).

The plaintiff brought claims against DSM and Valley officers and directors for breaches of trust, including intentional self-dealing and diversion of corporate opportunities. We agree with the judge's conclusion that the exculpatory clause of art. VI should not be enforced, because to do so would exculpate the defendants from liability for serious violations of fiduciary duty, such as those found by the judge. The defendants argue that, even if the clause were allowed to be enforced, an effective remedy would still be available for misconduct, because a shareholder could sue the voting trustee directly for any breach of fiduciary duty. That remedy, however, addresses only wrongs done to the shareholder personally; any injuries to the corporation itself could not be redressed if art. VI is permitted to bar shareholder derivative

[18]Voting trust agreements were first expressly authorized by statute in 1981, St. 1981, c. 393, § 1; the statutory provision was rewritten in 1986, St. 1986, c. 186, § 10. See G. L. c. 156B, § 41A.

suits.[19] No valid purpose of a VTA is served by insulating corporate officers and directors from any liability for intentional or wrongful violations of their fiduciary duties.

2. *The plaintiff's standing to bring suit on behalf of Valley.* The defendants contend that, even if art. VI is unenforceable, the plaintiff lacks standing to bring a shareholder derivative action on behalf of Valley because his interest in Valley is only as a beneficiary of the George A. Demoulas Family Trust, and the legal title to shares held by that trust rested with Sotakos as trustee. The defendants argue that by failing to bring suit himself, Sotakos effectively waived the plaintiff's right to bring a shareholder derivative action.

The judge concluded that the plaintiff, as the beneficial owner of shares in the family trust, had the right to bring a shareholder derivative action on behalf of Valley. We agree. We have stated that "a beneficiary of a trust of shares in a family corporation may in appropriate proceedings force an examination of the corporate affairs, and also the equivalent of a stockholders' suit." *Perry* v. *Perry,* 339 Mass. 470, 480 (1959). See *Symmons* v. *O'Keeffe,* 419 Mass. 288, 298-299 (1995) (plaintiff beneficiaries required to sue defendant directly for acts as trustee and derivatively for acts as corporate officer and director); *O'Brien* v. *Dwight,* 363 Mass. 256, 261-267, 281-292 (1973) (suit by beneficiaries of testamentary trust that owned shares in defrauded corporation). Indeed, as was the situation in *Perry,* the trustee may very well be the director whose operation of the corporation is being challenged. *Perry, supra* at 472-474. Consequently, the beneficiary is not required to depend on the trustee to bring such an action. The plaintiff could bring a shareholder

---

[19]The defendants seek to draw an analogy to New York decisions upholding the validity of voting trust provisions that require arbitration of shareholder derivative suits. See, e.g., *Siegel* v. *Ribak,* 43 Misc. 2d 7 (N.Y. Sup. Ct. 1964). Those cases are inapposite, as they address procedural requirements for resolving shareholder derivative suits, not provisions that would block such suits entirely. We also conclude that *King* v. *Driscoll,* 418 Mass. 576, 581-585 (1994), *S.C., ante* 1 (1996), which held that no public policy was violated by the termination of an employee for involvement in a shareholder derivative suit, is irrelevant to this case.

derivative action on behalf of Valley, and the exercise of this right was not foreclosed by Sotakos's inaction.[20]

B. *Statute of limitations.* Unless otherwise provided, tort actions must be commenced within three years after the cause of action accrues. G. L. c. 260, § 2A. A shareholder derivative action for breach of fiduciary duty through diversion of corporate opportunities and self-dealing sounds in tort. See *Woodcock* v. *American Inv. Co.,* 376 Mass. 169, 173-175 (1978) (action claiming conversion of corporate funds is tort claim); *O'Hara* v. *Robbins,* 13 Mass. App. Ct. 279, 283-285 (1982) (claim for appropriation of corporate opportunity considered as tort action). The plaintiff commenced this action on April 30, 1990. The defendants assert that the statute of limitations bars the plaintiff's claims for any causes of action that accrued more than three years before the commencement of the action.[21]

The judge ruled that the statute of limitations did not bar any of the plaintiff's claims. In reaching this conclusion, the judge applied the doctrine of "fraudulent concealment," an exception to the statute of limitations provided for in G. L. c. 260, § 12.[22] The judge further concluded that, when the breach of a fiduciary's duty to disclose constitutes the fraudulent conduct necessary to implicate § 12, the "repudiation of

---

[20]The defendants argue that Sotakos relinquished his right to bring a shareholder derivative suit on behalf of Valley by signing the VTA, and that Sotakos's action created a contract that is binding on the plaintiff. As we have already concluded that art. VI of the Valley VTA was properly not enforced, we need not consider the extent to which a beneficiary's rights as a shareholder may be limited by contracts entered into by a trustee.

[21]Some of the plaintiff's claims would survive even if the defendants' position on this issue were to prevail. For example, the actions that the plaintiff argues were diversions of corporate opportunities and unfair transfers of assets include the transfer of seventeen stores from DSM to Market Basket in 1988, and the opening of additional Market Basket stores thereafter.

[22]General Laws c. 260, § 12, reads as follows:

"If a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action."

trust" doctrine applies. Based on these doctrines, the judge stated in her decision that: "[T]he cause of action in this shareholder derivative suit 'accrues' against the individual shareholder when the fiduciary repudiates his or her obligations as a fiduciary and the shareholder has knowledge of such repudiation. . . . [T]he statute of limitations begins to run against the corporation when either disinterested and independent directors or disinterested shareholders knew of the wrongful activity." The judge found that (1) the defendants never repudiated their fiduciary obligations; (2) there were no disinterested directors on either the DSM or Valley boards; and (3) the defendants never disclosed to the only disinterested shareholders, namely the plaintiff and others on his side of the family, the facts that would have given notice to those shareholders of a cause of action. Consequently, the statute of limitations did not begin to run until sometime within the three-year period prior to the commencement of the action (when the plaintiff and his family, according to the judge, began to learn of the various violations of fiduciary duty by the defendants[23]), and the claims were consequently brought in a timely manner. We are in general agreement with this analysis. Additionally, the nature of a shareholder derivative action offers further support for tolling the limitations period in this action.

The repudiation of trust doctrine concerns the breach of fiduciary duties by a trustee, and the doctrine applies to the conduct of corporate officers and directors who stand in a fiduciary relationship toward the corporation. See *Houle* v. *Low*, 407 Mass. 810, 812-813 (1990); *Durfee* v. *Durfee & Canning, Inc.*, 323 Mass. 187, 196 (1948); *O'Hara* v. *Robbins*, 13 Mass. App. Ct. 279, 284-285 (1982). Our decisions applying the doctrine have consistently indicated that a cause of action does not accrue until the trustee repudiates the trust *and* the beneficiary has actual knowledge of that repudiation. See *Houle* v. *Low*, *supra* at 812 (plaintiff's cause of action for misappropriation of corporate opportunities accrued on day "he was *informed* of the vote not to invite him to participate"

---

[23]The judge did not state precisely when the statute of limitations began to run. The plaintiff testified that he did not learn of the seventeen-store transfer or of the separate corporate existence of Market Basket before the filing of the lawsuit, and that these transactions were disclosed in the process of discovery.

[emphasis supplied]); *Akin* v. *Warner*, 318 Mass. 669, 676 (1945) (cause of action does not accrue until repudiation "has *come home* to beneficiary" [emphasis supplied]); *Stuck* v. *Schumm*, 290 Mass. 159, 164 (1935) (oral repudiation of trust for intestate must be "open, definite, and *made to or brought to the attention*" of administrator [emphasis supplied]); *Greenfield Sav. Bank* v. *Abercrombie*, 211 Mass. 252, 259 (1912) (statute does not run until beneficiaries "have *learned of* the trustee's wrongdoing or of his practical repudiation of the trust" [emphasis supplied]).

When a defendant fraudulently conceals a cause of action from the knowledge of a plaintiff, the statute of limitations is tolled under G. L. c. 260, § 12, for the period prior to the plaintiff's discovery of the cause of action. Where a fiduciary relationship exists, the failure adequately to disclose the facts that would give rise to knowledge of a cause of action constitutes fraudulent conduct and is equivalent to fraudulent concealment for purposes of applying § 12. See *Puritan Medical Ctr., Inc.* v. *Cashman*, 413 Mass. 167, 175-176 (1992), and cases cited (fraudulent concealment under § 12 includes both affirmative acts done with intent to deceive, and breach of a fiduciary duty of full disclosure); *Stetson* v. *French*, 321 Mass. 195, 199 (1947) ("mere failure to reveal may be fraudulent where there is a duty to reveal"); *Burns* v. *Massachusetts Inst. of Technology*, 394 F.2d 416, 419 (1st Cir. 1968) (even in the absence of express trust, where fiduciary relationship arises from one party's repose of trust and confidence in another, breach of resulting duty of disclosure is substitute for active fraud normally required to constitute fraudulent concealment under § 12).[24] An actual knowledge standard applies to a plaintiff who argues that a breach of fiduciary duty of disclosure constitutes fraudulent concealment under G. L. c. 260, § 12. Such a plaintiff need only show that the facts on which the cause of action is based were not disclosed to him by the fiduciary. *Puritan Medical Ctr., Inc., supra* at

[24]The fraudulent concealment doctrine may apply in circumstances where the repudiation of trust doctrine does not, as where the court cannot identify a trustee-beneficiary relationship based on the existence of a trust. Conversely, under the repudiation of trust doctrine, even if the facts on which the cause of action are based are not concealed from, or undisclosed to, the plaintiff, the statute of limitations period does not run until the repudiation of fiduciary duty gives the plaintiff a "reason to complain." *O'Hara* v. *Robbins*, 13 Mass. App. Ct. 279, 284-285 (1982).

176-177. The plaintiff is not required to have made an independent investigation. *Stetson* v. *French, supra* at 199. See *Sanguinetti* v. *Nantucket Constr. Co.,* 5 Mass. App. Ct. 227, 237-238 (1977) (claim not barred where attorney fraudulently concealed through failure fully to disclose, and client lacked actual knowledge of facts).[25]

Because an actual knowledge standard applies in the circumstances of this case, we reject (as did the judge) the argument that the plaintiff should be held to a reasonable diligence standard so as to invoke the so-called discovery rule, applicable in most cases, that a cause of action accrues for purposes of the statute of limitations on the happening of an event likely to put the plaintiff on notice of facts giving rise to the cause of action. See, e.g., *Riley* v. *Presnell,* 409 Mass. 239, 243 (1991) (medical malpractice claims against psychotherapist); *Anthony's Pier Four, Inc.* v. *Crandall Dry Dock Eng'rs, Inc.,* 396 Mass. 818, 824-826 (1986) (express warranty of design); *Cannon* v. *Sears, Roebuck & Co.,* 374 Mass. 739, 742-743 (1978) (product liability); *Friedman* v. *Jablonski,* 371 Mass. 482, 485-486 (1976) (misrepresentation on sale of real estate); *Hendrickson* v. *Sears,* 365 Mass. 83, 89 (1974) (legal malpractice for negligent certification of title to real estate).[26] The objective standard of reasonableness developed in these

---

[25]Even in instances of active concealment not involving a duty to disclose, we have only attributed knowledge to a plaintiff who had actual knowledge of the facts, or had the means to acquire such facts, in circumstances where the probability of wrongdoing was so evident that possession of the means was equivalent to actual knowledge. See *Lynch* v. *Signal Fin. Co. of Quincy,* 367 Mass. 503, 507-508 (1975) (statute not tolled where plaintiff, who knew loan terms and extent of lender's disclosures, could have discovered nondisclosures by merely making mathematical calculations from known data); *Brackett* v. *Perry,* 201 Mass. 502, 505 (1909) (cause of action accrued when demand for payment from third party gave plaintiff full means to detect fraud by defendant). See also *Tracerlab, Inc.* v. *Industrial Nucleonics Corp.,* 313 F.2d 97, 98-102 (1st Cir. 1963) (in action against former employees' corporation for trade secret violation under Massachusetts law, plaintiff had only suspicion, opinion, and conjecture, not actual knowledge, and lacked means to obtain facts, until patent issued).

[26]We also reject the defendants' argument, that, for purposes of applying G. L. c. 260, § 12, the reasonable diligence standard should be followed to determine when the moment of "discovery" of a fraudulent concealment occurs. The defendants contend that such an approach would be consistent with the use of the same standard in our cases applying the discovery rule, as well as its use in Federal cases involving the fraudulent concealment doctrine. See, e.g., *J. Geils Band Employee Benefit Plan* v. *Smith Barney*

cases does not displace the actual knowledge standard that has been applied to violations of fiduciary duty that constitute fraudulent concealment under G. L. c. 260, § 12,[27] or to conduct involving a repudiation of trust.

The plaintiff submitted evidence that, for those causes of action that involved wrongdoing occurring more than three years prior to the commencement of the action, the statute of limitations was tolled by the failure of various key defendants, as corporate fiduciaries, fully to disclose material facts, known to them, on which those claims were based. Based on the evidence, and reasonable inferences that could be drawn therefrom, and on the assessment of the credibility of the witnesses, the judge found that, as a result of nondisclosures, the plaintiff was unaware of such critical facts as (1) the separate corporate existence of Seabrook Sales and P&P Foods; (2) the franchise relationships between those companies and DSM; (3) the separate existence of Lee Drug and the real estate companies Northland, Doric, and 231 Realty; (4) the separate existence of Market Basket; (5) the fact that DSM did not

Shearson, Inc., 76 F.3d 1245, 1253, 1259 (1st Cir.), cert. denied, 117 S. Ct. 81 (1996) (statute of limitations provision of Employee Retirement Income Security Act of 1974 incorporates Federal common law fraudulent concealment doctrine, which tolls limitations period until plaintiffs, in exercise of reasonable diligence, discover, or should have discovered, alleged fraud or concealment). However, we consider the discovery rule and the fraudulent concealment doctrine as distinct theories that address separate issues and impose different requirements for extending the period within which an action may be brought. Consequently, the Federal application of the fraudulent concealment doctrine is not necessarily equivalent to our law and may produce dissimilar outcomes.

[27]Even where a claim of fraudulent concealment does not involve a breach of fiduciary duty, actual knowledge only is imputed to the plaintiff in instances where he is provided with the means to ascertain the facts. Compare Bowen v. Eli Lilly & Co., 408 Mass. 204, 207-208 (1990) (only notice of "likely cause," not "probable cause," needed to start running of limitations period), and Malapanis v. Shirazi, 21 Mass. App. Ct. 378, 382-383 (1986) (in applying discovery rule to medical malpractice, limitations period begins to run when a reasonably prudent person in claimant's position, "reacting to any suspicious circumstances of which he might have been aware," i.e., "likely cause," should have discovered that he had been harmed by his physician's treatment [emphasis added]), with Tracerlab, Inc. v. Industrial Nucleonics Corp., supra at 102 (for accrual of cause of action in claim of fraudulent concealment, Massachusetts law "does not equate suspicion with knowledge," and instead requires actual knowledge [or, as an equivalent, full means of detecting the fraud]; "knowledge" of a fact means "no substantial doubts as to its existence").

own any of these companies; (6) the existence and exercise of Arthur T.'s option to acquire shares in Market Basket; and (7) the transfer of seventeen stores from DSM to Market Basket. The judge also found instances of affirmative misrepresentations by Telemachus, who told the plaintiff that P&P Foods was a "subsidiary" of DSM and that "Market Basket" was merely a trade name. The judge also found that, although the plaintiff and his family had signed documents alluding to Market Basket's separate corporate existence (such as an industrial revenue bond issued in connection with the construction of a store in Chelsea), they had not read those documents because of the express trust they placed in Telemachus and DSM's attorneys (at whose offices the documents were usually signed), and that the documents were never adequately explained and copies were not furnished. These findings of fact are supported by the evidence and, consequently, are not clearly erroneous. Based on the fiduciary relationship that existed between key defendants as corporate directors and the plaintiff as a shareholder (a matter we shall subsequently discuss), the statute of limitations was tolled for the plaintiff's claims arising from undisclosed, concealed, and misrepresented facts. We are satisfied that the judge did not err in concluding that the plaintiff lacked actual knowledge of the diversions of corporate opportunities and instances of self-dealing that are the basis of the claims.

A further basis exists for tolling the limitations period here. In a shareholder derivative action, the injured party is not only the plaintiff, but also the corporation itself, which is unable to act on its own behalf because it is under the control of the alleged wrongdoers. The focus in such an action should therefore be less on the degree of knowledge of potential plaintiffs, and more on the impracticality of expecting corporate wrongdoers to bring suits against themselves. *Resolution Trust Corp.* v. *Kerr*, 804 F. Supp. 1091, 1098 (W.D. Ark. 1992). The primary responsibility to protect the interests of a corporation rests with its officers and directors, and the limitations period should not run until disinterested and independent directors are in a position to act in the corporation's behalf against corporate wrongdoers. Therefore, when a corporation is the injured party in a shareholder derivative suit, the repudiation of trust and fraudulent concealment doctrines prevent the statute of limitations from running until

knowledge is gained by those who have the power and responsibility to act on the corporation's behalf and who are not themselves involved in the wrongdoing that is the basis for the cause of action. See *Samia* v. *Central Oil Co. of Worcester*, 339 Mass. 101, 112-113 (1959) (statute of limitations bars neither shareholder derivative action nor corporation counterclaim against directors of close corporation whose interests were adverse to assertion of claims). The judge found, with support in the evidence, that all members of the boards of directors of DSM and Valley during the periods in question either were members of Telemachus's family or were otherwise "interested" directors, in that they had a business or financial relationship with Telemachus, were subject to his controlling influence, or stood to benefit personally from the transactions at issue. See 1 ALI Principles of Corporate Governance: Analysis and Recommendations § 1.23 (1994) (hereinafter Principles of Corporate Governance).[28] The directors all either benefited from, or acquiesced in, the activities that are the basis of the plaintiff's claims on behalf of the corporations, and the limitations period therefore had not run on these claims before the commencement of the action.[29]

This conclusion is supported by cases from other jurisdictions that have applied the "adverse domination" doctrine. Under this doctrine, the statute of limitations is tolled while a corporate plaintiff continues under the domination of the wrongdoers. 3A W. Fletcher, Law of Private Corporations § 1306.20 (perm. ed. 1994 & Supp. 1996). Several versions of the doctrine exist. The most common one is the "disinterested majority" test, under which the statute does not run until a majority of board members are disinterested and the board is therefore able to act on behalf of the corporation against

---

[28]There was evidence that the plaintiff's brother, Evan, was a member of the DSM board from 1979 to 1984, and his mother, Evanthea, was a DSM director from 1971 until 1978. However, based on testimony at the trial, the trial judge found that Evan and Evanthea never attended any DSM board meetings and never knew that they were on the board of directors. Therefore, we agree with the trial judge's conclusion that there were no independent or disinterested directors on the board.

[29]We have elsewhere recognized the principle that the limitations period does not run where notice of a cause of action comes to a person who, though empowered to act on the plaintiff's behalf, has interests adverse to the plaintiff's. See *Bremer* v. *Williams*, 210 Mass. 256, 258 (1911) (statute of limitations does not bar suit against former trustee who embezzled funds).

the wrongdoers. See *FDIC* v. *Howse*, 736 F. Supp. 1437, 1441 (S.D. Tex. 1990) (under Texas law, corporation's cause of action against culpable directors does not accrue until a majority of disinterested directors have discovered or are put on notice of cause of action); *Hecht* v. *Resolution Trust Corp.*, 333 Md. 324, 352-353 (1994) (to rebut presumption that accrual did not take place while culpable directors were majority of board, defendants must show someone else had knowledge, ability, and motivation to act for corporation during their period of control). Other courts have proposed a stricter "complete domination" test, under which a plaintiff seeking to toll the statute of limitations must show that the culpable directors had full, complete, and exclusive control for the period at issue, so that there was no director or shareholder with knowledge who could have induced the corporation to bring an action. See *Mosesian* v. *Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 879 (9th Cir.), cert. denied, 469 U.S. 932 (1967); *International Rys. of Cent. Am.* v. *United Fruit Co.*, 373 F.2d 408, 412-417 (2d Cir.), cert. denied, 387 U.S. 921 (1967). See also *Hecht* v. *Resolution Trust Corp.*, *supra* at 338-353, and cases cited (discussing all versions of adverse domination doctrine).[30] Application of either version of the adverse domination doctrine would support tolling the statute of limitations in this action, because Telemachus and his family had complete and exclusive control of the DSM and Valley boards.

C. *Alleged bias of the judge.* We reject the various arguments that a new trial is required because the judge was not impartial.

The fact that the judge presided over the jury trial of the stock transfer action involving the plaintiff and some of the defendants is not a ground for automatic disqualification. The trial in that case involved issues different from this trial. Whatever impressions the judge may have gathered about the defendants in the stock transfer trial were "acquired . . . in [her] judicial role and not from an extrajudicial source."

---

[30]Many of the recent cases applying adverse domination doctrine involved Federal Deposit Insurance Corporation and Resolution Trust Corporation takeovers of failed banks and savings and loan associations, where no recovery would have been possible against culpable bank officials unless the statute of limitations were tolled for the time that those officials had been in charge. See cases cited in 3A W. Fletcher, Law of Private Corporations § 1306.20 (perm. ed. 1994 & Supp. 1996).

*Haddad* v. *Gonzalez,* 410 Mass. 855, 863 (1991), quoting *Commonwealth* v. *Dane Entertainment Servs.,* 18 Mass. App. Ct. 446, 450 (1984). "[N]ot subject to deprecatory characterization as 'bias' or 'prejudice' are opinions held by judges as a result of what they learned in earlier proceedings. It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant." *Liteky* v. *United States,* 510 U.S. 540, 551 (1994). The judge appears to have concluded that she would be able to act fairly and impartially in deciding the issues in the shareholder derivative action, and that, objectively considered, the case was not a proceeding in which her impartiality might reasonably be questioned based on assertions of bias or prejudice concerning any party. See *Haddad, supra* at 862.

None of the specific rulings cited by the defendants discloses a lack of impartiality on the judge's part. As will be discussed subsequently, she acted properly in striking the defendants' demand for a jury trial. She also acted well within her discretion in denying the defendants' motion to appoint a special litigation committee to evaluate the action (see generally *Houle* v. *Low,* 407 Mass. 810 [1990]), in view of the defendants' untimely request for a committee made on the eve of trial and the failure of DSM and Valley to act on votes to establish such a committee, taken by their respective boards of directors some four and one-half years earlier. Further, it was not an indication of bias on the judge's part to vacate (at the request of the plaintiff) the order granting a directed verdict entered at the trial of the stock transfer action in favor of Telemachus's children. The judge acted on the issue only after she had concluded the proceedings in this case and had determined that the culpability of Telemachus's children for wrongs to DSM made it necessary to charge them as constructive trustees in the stock transfer action.

The judge's use of a literary reference from Tennyson's "Ulysses" to begin her findings of fact and rulings of law[31] and the few sharp remarks alluded to by the defendants make no case for bias. The literary reference was the judge's stylistic

---

[31]The judge quoted eleven lines from the poem "Ulysses" by Alfred Lord Tennyson, in which Ulysses speaks lovingly of his son, Telemachus, expressing Ulysses's belief that Telemachus would rule wisely and decently after his death.

way of stating the theme of her decision, based on the facts she had found. The trial was long, arduous, and, at times, very bitter. "There might have been, from time to time, a momentary lapse — but, especially in a case as acrimonious as this one proved to be, 'appellate courts must grant the presider some margin of humanity.' " *Fashion House, Inc.* v. *K Mart Corp.*, 892 F.2d 1076, 1096 (1st Cir. 1989), quoting *United States* v. *Polito*, 856 F.2d 414, 418 (1st Cir. 1988).

The record does not support the defendants' conclusory argument that the judge precluded them from developing their affirmative defense of unclean hands based on the allegation that the plaintiff had electronically eavesdropped on private conversations of persons in the offices of DSM.

The defendants assert that the judge's bias was evident in her handling of issues of credibility and weight of the evidence and the nature of her fact finding. As has been discussed above, in applying the appropriate standard of review, we must give due regard to the judge's opportunity to judge the credibility of the witnesses, and we recognize that the judge's firsthand view of the evidence puts her in the best position to weigh its credibility. The judge made numerous findings of fact to support her conclusions as to the credibility of the witnesses. The defendants' assertion that the fact-finding process was tainted by judicial bias is wholly unpersuasive.

D. *Jury trial.* The judge properly denied the defendants' demand for a jury trial. There is no constitutional right to a jury trial when the cause of action arises in equity. *Commonwealth* v. *Guilfoyle*, 402 Mass. 130, 135 (1988), and cases cited. See *Parker* v. *Simpson*, 180 Mass. 334, 353-355 (1902) (the right of jury trial established by art. 15 of the Declaration of Rights to the Massachusetts Constitution does not encompass an equitable action). A shareholder derivative action that, like this case, is grounded on a breach of trust has traditionally been considered an equitable proceeding. See *Willett* v. *Herrick*, 242 Mass. 471, 482 (1922); *Hayden* v. *Perfection Cooler Co.*, 227 Mass. 589, 590-591 (1917); *Bartlett* v. *New York, N.H.& H.R.R.*, 221 Mass. 530, 532 (1915); *Converse* v. *United Shoe Mach. Co.*, 185 Mass. 422, 423 (1904). See also *Martin* v. *F.S. Payne Co.*, 409 Mass. 753, 760 (1991) ("Equitable considerations are relevant in derivative stockholder actions. Such considerations are most appropriate in dealing with relationships among stockholders in

close corporations"). Consistent with the trust theory, the plaintiff has primarily sought equitable relief in the form of an injunction, rescission and restitution, and an accounting. The judge also correctly determined that the claims against Frances, Glorianne, and Caren were essentially equitable in nature, and that they also were not entitled to a jury trial. We decline to adopt the approach for trials of this type in the Federal courts, stated in *Ross* v. *Bernhard*, 396 U.S. 531, 532-533 (1970), that "the right to jury trial attaches to those issues in derivative actions as to which the corporation, if it had been suing in its own right, would have been entitled to a jury." We have always considered a shareholder derivative action a unified concept, based in equity, that does not raise jury issues.[32] The defendants' request that jury issues be framed (a request contained in a footnote in their memorandum opposing the plaintiff's motion to strike the jury trial demand) did not constitute an appropriate motion under Mass. R. Civ. P. 39 (c), 365 Mass. 801 (1974). We do not fault the judge for not expressly ruling on the request, and we accept as correct her ruling that "[t]he case will proceed jury waived."

---

[32]The defendants cite several Massachusetts cases in support of their argument that a claim for breach of fiduciary duty may be either a legal or equitable action. However, in all these cases, the legal action was brought (or, the court indicates, could have been brought) directly by the corporation, not derivatively by a shareholder, and the corporation's claim involved money damages. See *Regional Land Corp.* v. *McLaughlin*, 334 Mass. 276, 277, 281 (1956) (corporation may bring action at law against directors, seeking damages for breach of contract and breach of fiduciary duty); *Baker* v. *Allen*, 292 Mass. 169, 173 (1935) (action against directors for waste, seeking damages and restitution, might be brought by a corporation at law or in equity, but when brought by shareholders, in equity); *Cosmopolitan Trust Co.* v. *Mitchell*, 242 Mass. 95, 118-121 (1922) (bank commissioner may sue trust company directors in equity for losses due to negligence and misconduct; remedy at law is not exclusive); *Hill* v. *Murphy*, 212 Mass. 1, 3 (1912) (liability of directors, for loss to corporation from libel award, could be established through an action at law by the corporation or in equity by the shareholders); *Von Arnim* v. *American Tube Works*, 188 Mass. 515, 520-521 (1905) (shareholder may bring equitable action against directors for payments of excessive salaries, in circumstance where corporation could have brought action at law for restitution). None of these cases contradicts our settled rule that jurisdiction over violations of fiduciary duty is equitable in character. See *Boston* v. *Dolan*, 298 Mass. 346, 354-355 (1937) (city treasurer may be sued in equity for breach of fiduciary duty, regardless of possible remedy at law, and cannot claim trial by jury as matter of right).

## IV. Diversion of Corporate Opportunities and Assets.

The judge found that DSM and Valley had been injured when "corporate opportunities," namely, potential business ventures that should rightfully have been offered to those corporations, were instead pursued either by the individual defendants or by other companies in which those defendants held ownership interests. The judge found as well that "self-dealing" transactions had occurred in which defendants who had fiduciary duties to DSM and Valley transferred assets from those corporations to other defendant-owned companies, for less than fair value. The requirements that determine the propriety of pursuing corporate opportunities and engaging in self-dealing transactions are similar, and will be referred to here as the "corporate opportunity doctrine."[33] In applying the doctrine to the facts of this case, we agree with the judge's conclusions that the defendants participated in, or benefited from, improper diversions of corporate opportunities and self-dealing transactions, to the detriment of DSM and Valley.

The directors of a corporation stand in a fiduciary relationship to the corporation. *Durfee* v. *Durfee & Canning, Inc.*, 323 Mass. 187, 196 (1948). They owe to the corporation both a duty of care and, more significantly for this case, a paramount duty of loyalty. "They are bound to act with absolute fidelity and must place their duties to the corporation above every other financial or business obligation. . . . They cannot be permitted to serve two masters whose interests are antagonistic." *Spiegel* v. *Beacon Participations, Inc.*, 297 Mass. 398, 410-411 (1937). In the case of a close corpora-

---

[33]It can be argued that self-dealing transactions and diverted corporate opportunities are distinguishable, and that approval of the former by a board of directors should be subject to stricter scrutiny. Compare 1 ALI Principles of Corporate Governance: Analysis and Recommendations, § 5.02 (1994) (hereinafter Principles of Corporate Governance) (self-dealing transaction may be authorized by disinterested directors who "could reasonably have concluded that the transaction was fair to the corporation"), with § 5.05 (taking of corporate opportunity acceptable if disinterested directors reject the opportunity "in a manner that satisfies the standards of the business judgment rule"). The distinction is not important in this case, where none of the boards consisted of disinterested directors and the primary issues, for both types of ventures, are disclosure and fairness.

tion,[34] which resembles a partnership, duties of loyalty extend to shareholders, who owe one another substantially the same duty of utmost good faith and loyalty in the operation of the enterprise that partners owe to one another, a duty that is even stricter than that required of directors and shareholders in corporations generally. *Donahue* v. *Rodd Electrotype Co. of New England, Inc.,* 367 Mass. 578, 592-594 (1975). In the often repeated words of then Chief Judge Cardozo of the New York Court of Appeals, "[n]ot honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior" that describes this more rigorous duty. *Id.* at 594, quoting *Meinhard* v. *Salmon,* 249 N.Y. 458, 463-464 (1928).

The corporate opportunity doctrine is rooted in the principle that corporate directors and officers are bound by their duty of loyalty to subordinate their self-interests to the well being of the corporation. A person who owes a fiduciary duty to a corporation is prohibited from taking, for personal benefit, an opportunity or advantage that belongs to the corporation. 1 J.D. Cox & T.L. Hazen, Corporations § 11.7 (1995). In selecting a test for determining which ventures rightfully belong to a corporation, and are subject to the corporate opportunity doctrine, the corporation deserves broad protection. Rather than limiting the doctrine's coverage only to those instances where the proposed venture is demonstrably similar to existing and prospective corporate activities, the focus is on the paramount obligations of the fiduciary. In keeping with this principle, we have stated that "the true basis of the governing doctrine rests fundamentally on the unfairness in the particular circumstances of a director, whose relation to the corporation is fiduciary, 'taking advantage of an opportunity [for his personal profit] when the interests of the corporation justly call for protection. This calls for the application of ethical standards of what is fair and equitable . . . [in] particular sets of facts.' " *Durfee, supra* at 199, quoting Ballantine, Corporations 204-205 (rev. ed. 1946). This "fundamental fairness" test places the burden

---

[34]We have defined a close corporation as "typified by: (1) a small number of stockholders; (2) no ready market for the corporate stock; and (3) substantial majority stockholder participation in the management, direction and operations of the corporation." *Donahue* v. *Rodd Electrotype Co. of New England, Inc.,* 367 Mass. 578, 586 (1975).

on the fiduciary who acquires a corporate (or partnership) opportunity, or who engages in self-dealing, "to prove that his or her actions were intrinsically fair, and did not result in harm to the corporation or partnership." *Meehan* v. *Shaughnessy,* 404 Mass. 419, 441 (1989). See *Starr* v. *Fordham,* 420 Mass. 178, 183 (1995).

Other recent formulations of the corporate opportunity doctrine have given a similar broad definition to the scope of potential corporate interests, and have focused on the responsibility of the fiduciary to present these possibilities to the corporation for its consideration. For example, a corporate opportunity has been defined, in part, as "[a]ny opportunity to engage in a business activity of which a director or senior executive[35] becomes aware," either in connection with performing the functions of those positions, or "[t]hrough the use of corporate information or property, if the resulting opportunity is one that the director or senior executive should reasonably be expected to believe would be of interest to the corporation." Principles of Corporate Governance § 5.05 (b) (1) (1994). See ABA Corporate Director's Guidebook (rev. ed.), 33 Bus. Law. 1591, 1600 (1978) (doctrine applies to any opportunity "relevant to the enterprise's present or prospective business activities"); Brudney & Clark, A New Look at Corporate Opportunities, 94 Harv. L. Rev. 997, 1032 n.108 (1981) (definition should leave little room for director to appropriate any opportunity conceivably advantageous to corporation, without its consent); Principles of Corporate Governance, *supra* at § 5.05, Reporter's Note at 298 (reviewing various "tests" of corporate opportunity).

A director or officer is not entirely barred from pursuing a corporate opportunity, but a person holding either position cannot do so unless the opportunity is first offered to the corporation and rejected by it. In this aspect, the corporate opportunity doctrine may be considered to be a rule of disclosure. *In re Tufts Elecs., Inc.,* 746 F.2d 915, 917 (1st Cir. 1984), citing *Durfee, supra* at 200. To satisfy the principle of fairness to the corporation and to meet his duty of loyalty,

---

[35]The term "senior executive" has been defined as encompassing the corporation's president, treasurer, and secretary, as well as chief operating officers and vice-presidents who are in charge of principal business units or functions or who perform a major policymaking function. See Principles of Corporate Governance, *supra* at §§ 1.27, 1.33.

the fiduciary must fully disclose to the corporation, all material facts concerning the opportunity. See *Production Mach. Co.* v. *Howe*, 327 Mass. 372, 375 (1951) (defendant failed to make "full disclosure which as a fiduciary he owed"); Principles of Corporate Governance, *supra* at § 5.05 comment to § 5.05 (a), at 287-288 (director or senior executive must offer opportunity to the corporation before taking it for personal advantage, and should disclose all known material facts). Similarly, to satisfy the duty of loyalty, a fiduciary wishing to engage in a self-dealing transaction must disclose details of the transaction and the conflict of interest to the corporate decisionmakers. See *Puritan Medical Ctr. Inc.* v. *Cashman*, 413 Mass. 167, 172 (1992) (self-dealing not ratified in absence of full disclosure); *Dynan* v. *Fritz*, 400 Mass. 230, 243 (1987), *S.C.*, *Martin* v. *F.S. Payne Co.*, 409 Mass. 753 (1991) (good faith requires "full and honest disclosure of all relevant circumstances"); Principles of Corporate Governance, *supra* at § 5.02 (a).

The disclosure requirement takes from the fiduciary the power to decide whether the opportunity or self-dealing transaction is in the corporation's interest and removes the temptation posed by "a conflict between self-interest and integrity." *Durfee, supra* at 198, quoting *Michoud* v. *Girod*, 45 U.S. (4 How.) 503, 555 (1845). The conflict may be avoided and fairness to the corporation best ensured if the venture is considered, and a decision made on behalf of the corporation, by disinterested members of the board of directors (or, alternatively, disinterested shareholders). Where the board's decision is made by persons who are subject to the control of the self-interested fiduciary, or who have an interest themselves in the proposed transaction or opportunity, that decision obviously is subject to the same potential for conflict of interest that would exist with a decision made by the fiduciary alone. Therefore, where a corporate opportunity or self-dealing transaction is disclosed to the corporation, but the decision on it is made by self-interested directors, the burden is on those who benefit from the venture to prove that the decision was fair to the corporation.[36]

The defendants argue that certain ventures at issue, in par-

---

[36]We consider the standards set out in the ALI Principles of Corporate Governance, *supra*, to be in conformance with the principles we have stated here. See *id.* at §§ 5.02 (self-dealing) and 5.05 (corporate opportunities). As

ticular the formation of Seabrook Sales and P&P Foods, were not corporate opportunities for DSM, because the New Hampshire liquor laws then in effect made it legally impossible for DSM to own those companies. We disagree with this argument, which would limit a fiduciary's duty of disclosure to those enterprises judged by the fiduciary to be within the corporation's legal, financial, or institutional capabilities. Establishing such a threshold test for defining a corporate opportunity would contradict the principle just discussed, that a fiduciary who is interested in pursuing an opportunity should not make the decision as to whether the venture is also of interest to the corporation. Instead, to ensure fairness to the corporation, opportunities must be presented to the corporation without regard to possible impediments, and material facts must be fully disclosed, so that the corporation may consider whether and how to address these obstacles. See *Durfee, supra* at 200-202 (corporation's alleged credit weakness does not allow director to exploit opportunity); *Energy Resources Corp.* v. *Porter*, 14 Mass. App. Ct. 296, 299-302 (1982) (contractor's refusal to deal with corporation not a defense for an officer who formed his own firm to pursue the opportunity without fully disclosing the reasons for the refusal); *Cain* v. *Cain*, 3 Mass. App. Ct. 467, 476-477 (1975) (officer must disclose customer dissatisfaction to corporation before pursuing opportunity through separate company). See also Principles of Corporate Governance, *supra* at § 5.05, Reporter's Note at 299-300 (corporation is to determine for itself whether obstacles are insuperable). Without such a rule, the fiduciary's self-interest may cloud his judgment or tempt him to overlook his duties. For example, where a third party ostensibly is unwilling to deal with the corporation, "[w]ithout full disclosure it is too difficult to verify the unwillingness to deal and too easy for the executive to induce the unwillingness." *Porter, supra* at 300-301. In the present case, it was up to DSM, not the defendants, to determine whether any legal obstacles faced by DSM in pursuit of ventures in New Hampshire were insurmountable.

In short, to meet a fiduciary's duty of loyalty, a director or officer who wishes to take advantage of a corporate op-

has been indicated, the ALI Principles offer somewhat different standards of review for decisions of disinterested boards, depending on whether self-dealing or corporate opportunity is involved.

portunity or engage in self-dealing must first disclose material details of the venture to the corporation, and then either receive the assent of disinterested directors or shareholders, or otherwise prove that the decision is fair to the corporation. Otherwise, the officer or director acts in violation of his fiduciary duties, and whatever gain or advantage that he acquires may be held for the benefit of the corporation so as to deny him any benefit or profit. *Durfee, supra* at 198, citing *Guth* v. *Loft, Inc.*, 23 Del. Ch. 255, 270 (1939).

With these principles in mind, we next examine the ventures and transactions that the judge found to have been conducted in violation of the fiduciary duties of DSM's and Valley's directors and officers. All the individual defendants[37] have served as directors and as officers (with the exception of Glorianne) of various Demoulas enterprises, but not all held such positions with the injured corporations DSM and Valley. Telemachus has been president of DSM since George's death in 1971, and a director of DSM throughout its existence (as well as sole voting trustee of all DSM stock, with the resulting authority to choose the other directors). He has been president and a director of Valley since its formation in 1974. He was also treasurer and a director of Northland Properties, and has been a director of Market Basket since 1986. Arthur T. has been vice-president and a director of DSM since 1978, and treasurer and a director of Valley since 1974. He has also been president and a director of Lee Drug; from 1986 on, the president, treasurer, and a director of Market Basket; from 1985 on, the president, treasurer, and a director of Doric Development; the president and a director of Northland; and the managing partner of 231 Realty. Irene was a director of DSM (from 1974 to 1990) and a director of Northland, and (from 1986 on) has been a director of Market Basket. Frances was the president and treasurer of Market Basket until 1986, and has been a director of Market Basket and its predecessor, P&P Foods. She has also been a director of Lee Drug and of Doric Development, and a partner of 231 Realty. Caren was the president and treasurer of Doric Development until 1985, and has been a director since 1981; she has also been a director of Lee Drug, a director of Mar-

---

[37]We exclude from this discussion D. Harold Sullivan, who (as will be explained later in this opinion) we have determined should be dismissed from the case.

ket Basket from 1986 on, and a partner of 231 Realty. Glorianne was a director of Lee Drug until 1985, and has been a director of Doric Development (beginning in 1985) and Market Basket (beginning in 1986) and a partner of 231 Realty.

A. *Market Basket.* The judge concluded that Market Basket represents a corporate opportunity that rightfully belonged to DSM and was diverted from it in a breach of fiduciary duty, and that its assets are derived from that diversion or from additional wrongful self-dealing transactions. She therefore ordered the return of Market Basket's assets and liabilities to DSM. We conclude that the result reached by the judge is supported by her extensive factual findings (which in turn have support in the evidence).

Market Basket's status as a diverted corporate opportunity is based on the history of its predecessor corporations, Seabrook Sales and P&P Foods, which has been discussed. Both were corporate opportunities of DSM that were never made available to the corporation, and both were diverted in a breach of fiduciary duty by a director-officer (Telemachus). The defendants argue that Seabrook Sales and P&P Foods were not corporate opportunities for DSM, because New Hampshire liquor laws restricted the number of licenses for beer sales available to a person or entity,[38] and thus DSM could not have opened additional supermarkets in that State (except by forgoing beer and wine sales). However, as we have just indicated, the existence of a legal or other impediment is a matter for a corporation's board to consider when deciding whether to accept or decline an opportunity that has been disclosed to it, and the existence of any impediment does not excuse the failure of a fiduciary to present the opportunity to the board and to disclose all material details before pursuing it himself. If these opportunities had been disclosed to the board of DSM and rejected, then, given the absence of a disinterested and independent board, the fiduciary would have had to show that the rejection was fair to the corporation, and the existence of legal impediments would have been relevant to determining the fairness of the fiduciary's action. However, because full disclosure did not

---

[38]Until 1981, New Hampshire law did not allow a person or entity to own more than two retail licenses to sell beer and wine for off-premises consumption. This limit was increased to six in April, 1981. The restriction was removed entirely in July, 1985.

occur here, we do not need to address whether DSM could have feasibly pursued these opportunities. The nondisclosure of a corporate opportunity is, in itself, unfair to a corporation and a breach of fiduciary duty.[39]

The creation of Seabrook Sales and P&P Foods was a breach of Telemachus's fiduciary duty of loyalty, notwithstanding the fact that the companies were initially owned by persons who were not themselves directors or officers of DSM. (As has been mentioned, Telemachus's sister Ann Burliss owned Seabrook, and his daughter Frances owned P&P Foods. In 1981, Frances exercised an option that had been arranged by Telemachus and purchased Seabrook from Burliss.) A fiduciary is liable either where he benefits directly or where profits flow instead to a third party or to another company under the fiduciary's control. *Durfee, supra* at 196. *Production Mach. Co.* v. *Howe*, 327 Mass. 372, 378 (1951). See Principles of Corporate Governance, *supra* at §§ 1.03, 5.08 (fiduciary violates duty of loyalty by advancing pecuniary interests of associate, such as a child or sibling, in manner that would constitute a breach if he had acted for himself). It is clear from the judge's findings that these companies were set up at Telemachus's direction and were independent in name only. DSM, which Telemachus fully controlled, managed and financed the operations of these companies. The use of DSM's corporate resources to support these companies indicates that they were wrongfully diverted corporate op-

---

[39]The conclusion, that neither opportunity was disclosed to DSM and rejected by the board before being pursued by Telemachus, is based on the chronology of events and the available corporate records. Construction of the Seabrook store began six to twelve months before its opening in July, 1973. The DSM board first discussed the possibility of franchising at its meeting on June 19, 1973, but only in general terms and without reaching a final decision. The board merely instructed Telemachus to present further information, at a later date, on the feasibility of franchising. The name of the proposed franchisee was not revealed at the meeting. Seabrook Sales was incorporated just two days later and entered into a franchise agreement with DSM on July 3, the same day that it applied for a New Hampshire liquor license (asserting in its application that no other corporation had any supervisory control over Seabrook or its employees). The store opened on July 8, 1973. In the case of P&P Foods, the DSM board's only involvement was to waive restrictions on the sale of DSM stock and thereby allow Frances to sell her stock to Arthur T.; her continued ownership of DSM stock would have made her ineligible to acquire beer licenses on behalf of P&P Foods. Three weeks after the waiver, stock in P&P was issued to Frances, and P&P opened its first store.

portunities. See 1 J.D. Cox & T.L. Hazen, Corporations § 11.7, at 11.33, 11.39 (1995) (fiduciary's use of corporate assets or personnel to acquire or nurture opportunity indicates breach of duty of loyalty).

Seabrook Sales opened its second store in 1975 under the Market Basket name (which had previously been registered by DSM in both Massachusetts and New Hampshire), and changed its corporate name to Market Basket, Inc., in 1979 (with DSM's permission). In 1981, P&P Foods exercised Frances's option and acquired Market Basket, Inc.[40] The latter was a subsidiary of P&P Foods until the two were merged in December, 1983; the next month, P&P changed its name to Market Basket. By this time, the company owned seven stores: six in New Hampshire, and one in Chelsea, Massachusetts (a store whose ownership by Market Basket instead of DSM belies the defendants' argument that Seabrook Sales and P&P Foods were created simply to overcome New Hampshire liquor law restrictions).

Because the entity that is now Market Basket arose from the merger of two diverted corporate opportunities that rightfully belonged to DSM, the relief ordered with respect to the current assets and liabilities of Market Basket could rest on that fact alone. However, two later transactions that were addressed by the judge lend additional support to this conclusion and implicate other parties besides Telemachus. These events were the 1986 sale of part of Frances's Market Basket stock to other members of Telemachus's family, and the sale of seventeen DSM stores to Market Basket, which was approved in 1987, and carried out in 1988.

The sale of Frances's stock was a diverted corporate opportunity for DSM, because it involved the exercise of an option on that stock held by Arthur T., a DSM director. In 1981, Frances and Arthur T. had entered into an agreement by which Frances was given the option to reacquire the DSM stock she had sold to Arthur T. in 1978, at the same price for which she had sold it. Upon Frances's exercise of that option, Arthur T. could acquire all or part of her 300 shares in P&P Foods (as it was then still called) for $600 a share. In 1986, Frances exercised her option, and Arthur T., along with other

---

[40]The purchase was made shortly after the New Hampshire liquor laws were amended, increasing to six the limit on the number of beer and wine licenses that could be held by one entity.

members of Telemachus's family whom Arthur T. designated as his nominees, purchased 210 of Frances's 300 shares.[41] Several days before the purchase of stock, the control of Market Basket was reorganized. Arthur T. became president and treasurer in place of Frances, and Arthur T., Telemachus, Irene, Caren, and Glorianne joined Frances as board members. The judge concluded, and we agree, that Market Basket was a corporate opportunity for DSM, and that Arthur T. was under an obligation as a DSM director to make his option on Frances's Market Basket stock available to DSM before pursuing the opportunity on his own (and his family's) behalf. The defendants argue that Arthur T.'s agreement with Frances came about because of their relationship as brother and sister, not as an incident of Arthur T.'s position as a DSM director, and that Arthur T.'s option to acquire Frances's Market Basket stock was therefore not a corporate opportunity. We reject the defendants' argument. Arthur T. became an officer and director of DSM in 1978. From that time forward, his paramount duty of loyalty to the corporation required him to make available to it any potential business activity that he could reasonably be expected to believe would be of interest to DSM. The defendants have framed the legal issue incorrectly, as Arthur T.'s familial relationship with Frances is immaterial in determining whether the option was a corporate opportunity. The cases cited by the defendants to support their position are inapposite, as they concern property interests that originated prior to the fiduciary's involvement with his corporation. See, e.g., *Puritan Medical Ctr., Inc.* v. *Cashman*, 413 Mass. 167, 177-178 (1992).[42]

The second incident, the sale of seventeen DSM stores to Market Basket, is an instance of self-dealing, because by the

---

[41]The sale of Frances's Market Basket stock was recorded on December 30, 1986, while her reacquisition of DSM stock did not actually occur until several days later, on January 2, 1987. We attach no significance to this sequence. In the sale of Frances's stock, ninety shares went to Arthur T., sixty to Irene, thirty to Telemachus, and fifteen each to Caren and Glorianne, leaving Frances with ninety shares. One day later, Northland Properties was merged into Market Basket. As a result of that event, the ownership percentages in Market Basket were as follows: Arthur T., thirty per cent; Irene, Frances, Caren, and Glorianne, fifteen per cent each; and Telemachus, ten per cent.

[42]Because Arthur T. became a corporate fiduciary in 1978, we need not determine whether he was obligated to present the opportunity to DSM in 1981, when he acquired his contingent option, or not until 1986, when he

time of that event, Telemachus, Arthur T., and Irene were directors of both DSM and Market Basket (and Arthur T. was an officer of both). Because the transaction was not disclosed to disinterested directors of DSM (there were no such directors) or disinterested shareholders (the plaintiff being the only one) for their approval, the burden was on the defendants to demonstrate that the transaction was fair to DSM at the time that it was entered into. The defendants failed to meet this burden.

The judge focused on an absence of good faith in the transaction, and found that the "plan" for the reorganization of DSM and Market Basket was actually an after-the-fact fabrication designed to offer strategic business justifications for what was, in reality, a decision by Telemachus to transfer from DSM to Market Basket all the stores that had been opened in the years since George's death. The judge also pointed to changes made in the sales agreement after its approval by the DSM board, changes which had the effect of reducing the amount to be received by DSM for the stores, and to the consequent declines in revenues and earnings for DSM, matched by corresponding increases for Market Basket. We do not need to accept the judge's assessment of the defendants' motives to reach the same conclusion. The transfer of the stores was unfair and detrimental to DSM.[43] What matters to our decision is not *why* the defendants did what they did, but simply *what* they did. Even if the alleged

was first enabled to invoke that option. Our conclusion is the same in either case.

[43]The defendants argue that the judge misapplied our decision in *Dynan* v. *Fritz*, 400 Mass. 230 (1987), *S.C.*, *Martin* v. *F.S. Payne Co.*, 409 Mass. 753 (1991), by ruling that an absence of good faith voids a self-dealing transaction, regardless of its fairness. The plaintiff argues in favor of precisely such a ruling. We think that both parties have misinterpreted the trial judge's ruling, and we do not read that ruling to conflict with our decision in *Dynan*. In that case, we did not disregard fairness or displace it with a requirement of good faith. Rather, we considered the requirement of fairness to encompass both a fair process and a fair value. In the circumstances of that case, the decision-making process was so unfairly dominated by the interest of the self-dealing party as to exhibit bad faith. Properly interpreted, *Dynan* is thus consistent with the "fundamental fairness" test set forth in *Durfee* v. *Durfee & Canning, Inc.*, 323 Mass. 187, 199 (1948). See Principles of Corporate Governance, *supra* at § 5.02 comment to § 5.02 (a) (2) (A) (in determining fairness, court may take into account both the approval process, including undue pressure on the decisionmaker, and indicators of fairness of price).

plan was indeed a contemporaneous rationale for the sale, the business strategy it proposes is unconvincing and illogical. The judge could reasonably have concluded that, if the plan had been fully implemented (which it was not), the result would have been detrimental to DSM. We are, in any event, unconvinced that the terms of the sale offered fair value to DSM. DSM was to be paid one per cent of the stores' sales each year, for twelve years. Based on 1987 sales, that payment would have been $3.2 million a year. By comparison, the annual pretax earnings of the seventeen stores in 1987 were approximately $17.3 million, or about five per cent of sales. The defendants have failed to prove that it is better to receive one per cent of sales rather than five per cent of sales.

B. *Lee Drug.* The defendants do not dispute that Lee Drug was a corporate opportunity belonging to DSM, but they contend that the potential venture was fully disclosed to the DSM board and clearly rejected by it, so that it was not wrongful thereafter for Arthur T. to pursue the opportunity himself. The judge characterized Arthur T.'s disclosure to the board as "misleading, inaccurate, and materially incomplete," and noted as well the lack of independence of the board. On this basis, the judge ordered payment to DSM of the proceeds from the 1990 sale of the Lee Drug chain to Walgreen Eastern Company, Inc. We conclude that Lee Drug represented a wrongfully diverted corporate opportunity, and that the judge did not err in ordering payment of the sale proceeds. We reach this conclusion by applying the principles of the corporate opportunity doctrine that we have previously stated. Before Arthur T. could pursue the opportunity, he was required to disclose it fully to the corporation, and because the corporation's rejection of the opportunity for itself was made by neither a disinterested board nor disinterested shareholders, Arthur T. also had to prove that the rejection was fair to the corporation. We agree with the judge's characterization of the disclosure to the board and further conclude, from the manner in which Lee Drug was thereafter operated, that the rejection of the opportunity was unfair to DSM.

The minutes for a meeting of the DSM board held on June 14, 1983, indicate that Arthur T. presented information to the board on the potential operation of drug stores by DSM. According to the minutes, Arthur T. mentioned that a sepa-

rate management team would be needed to operate a drug store division, and that pharmacy license requirements were different in Massachusetts and New Hampshire. The directors decided that "too many problems" would be involved in such an operation. They voted not to set up a drug store division within DSM, and stated that they had no objection to Arthur T. (or any other director) setting up a separate operation on his own. In October, Lee Drug was incorporated. Its board of directors consisted of Arthur T., Frances, Caren, and Glorianne. Eventually it opened nine stores, seven of which were at locations leased from Demoulas entities.

If the minutes are to be taken at face value, the board was not informed, at the June 14, 1983 meeting, how extensively DSM would actually be involved in the operation of Lee Drug. There was no separate management team: DSM employees ran Lee Drug; Lee Drug's office was the DSM headquarters; DSM loaned to Lee Drug the funds needed to establish the drug store chain; and DSM provided Lee Drug with advertising, payroll, accounting, and computer services. This information would have been material to the decision of the DSM board and should have been disclosed to it. The board also failed to investigate whether the asserted differences in State pharmacy licensing requirements would have been a significant obstacle for DSM in operating its own drug store division. The company, after all, already operated supermarkets in both States, so it was experienced in handling such regulatory variations. Based on these facts, we agree with the judge that full disclosure of the corporate opportunity was not made to DSM, and that the rejection of the venture was unfair to DSM. Lee Drug was a corporate opportunity that was wrongfully diverted from DSM.

C. *Real estate entities.* In the years before George's death, he and Telemachus had set up separate companies and subsidiaries to own and develop the sites upon which DSM stores were to be located. Among these was DSM Realty, a wholly owned subsidiary of DSM, which was incorporated in 1967.[44] After George's death, two additional companies were formed for this purpose: Delta & Delta (established in 1971) and Valley Properties (1974). Three realty trusts that had been created during George's lifetime were then merged into Valley. The members of George's and Telemachus's families held

[44]DSM Realty was merged with DSM at the end of 1986.

equal interests in Valley and Delta & Delta. Beginning in 1979, other real estate companies were formed that were owned entirely by members of Telemachus's family. These included Northland Properties, Inc. (incorporated in 1980[45] ); Doric Development Corporation, Inc. (incorporated in 1981); and 231 Realty Associates (a partnership formed in 1985). We agree with the judge's conclusion that the formation of Northland, Doric Development, and 231 Realty were corporate opportunities that were wrongfully diverted from Valley and DSM Realty.[46] These companies all engaged in the same range of commercial real estate purchase, development, and management activities as Valley and DSM Realty. The only significant difference between the new and the preexisting companies was the pattern of ownership. In the years after the new companies were formed, all the real estate projects pursued by those companies could have been carried out by Valley and DSM Realty. On several occasions, parcels were transferred to the new companies from Valley, DSM Realty, and Delta & Delta at less than fair market value.[47]

No evidence was presented that the formations of Northland, Doric Development, and 231 Realty were disclosed to DSM and Valley. The defendants did not contend otherwise, but instead argued that these were not corporate opportuni-

---

[45]Northland was originally established as a realty trust in 1979, with Arthur T. as trustee. On incorporation, Telemachus, Arthur T., and Irene became the directors. Telemachus and Irene each owned ten per cent of the entire stock, and the four children each owned twenty per cent; voting rights were limited to the stock held by Telemachus, Irene, and Arthur T.

[46]Northland was merged into Market Basket in 1986. The imposition of a constructive trust on Market Basket therefore encompasses the assets gained by Northland during its existence, as well as those attributable to the supermarket operations of Market Basket.

[47]The defendants dispute the judge's findings on the value of the parcels involved. However, valuation of property is a question of fact. Sarrouf v. New England Patriots Football Club, Inc., 397 Mass. 542, 550 (1986). Thus, a finding of valuation is subject to review under the "clearly erroneous" standard, and we will accept a judge's findings based on the evidence or a reasonable inference from it. Id. Anthony's Pier Four, Inc. v. HBC Assoc., 411 Mass. 451, 483 (1991) (judge's award fell within range of value based on opinions testified to at trial). In this case, each side had expert witnesses testify as to property valuations, and the judge did not clearly err in placing more weight on the testimony of the plaintiff's witness. In several cases, both the defendants' and the plaintiff's witnesses agreed that properties had been transferred for less than fair value and only differed as to how much less.

ties because of a separation of functions among the real estate entities, or, alternatively, because there was an understanding among members of both Demoulas families to assign the interests in real estate projects in this fashion. Neither argument is plausible on its face, and, even if credible, neither would meet the requirements for a fiduciary's pursuit of a corporate opportunity. First, there was no practical or legal restriction on the ability of DSM and Valley to engage in additional real estate ventures. Even if there had been, we have already noted that the existence of such a restriction does not excuse a failure to disclose a corporate opportunity. Second, an agreement among individuals would not have relieved Telemachus, Arthur T., and Irene of their obligations as fiduciaries of DSM (and for the first two, as directors of Valley) to place the corporation's interests ahead of their own.

Because the very formation of the three new companies was a diversion of corporate opportunities, the assets of those companies, which reflect profits made since their formation, rightfully belong to DSM and Valley. Consequently, we conclude that it is unnecessary to review the separate transactions among the new and old companies, which the judge examined in considerable detail in her findings of fact. We discern ample basis in those findings for a conclusion that real estate activities were carried out in a manner that was unfair to DSM and Valley. Any new property development that was undertaken by Northland, Doric Development, or 231 Realty should have first been made available, as a corporate opportunity, to DSM and Valley, because one or more directors or partners of the benefiting companies were also directors of DSM and Valley. Properties that were initially owned by DSM or Valley were transferred to the new companies at less than fair value, benefiting the DSM and Valley corporate fiduciaries who had interests in the new companies. In the case of properties that were transferred from Delta & Delta to the new companies, any injury to Delta & Delta is not relevant, because that company is not a party to this suit. However, in each instance, Telemachus had the obligation as a director of DSM and Valley to offer the property to those companies first, and this he did not do.

In serving simultaneously as directors of either DSM or Valley, or both, and as directors of one or more of the new real estate companies, Telemachus, Arthur T., and Irene cre-

ated inevitable conflicts of interest among their fiduciary duties to different companies. A fiduciary who places himself or herself in such a situation does not thereby gain the option of choosing which company to favor. Principles of Corporate Governance, *supra* at § 5.05, Reporter's Note at 300. Directors "cannot be permitted to serve two masters whose interests are antagonistic." *Spiegel* v. *Beacon Participations, Inc.*, 297 Mass. 398, 411 (1937). A director faced with such a conflict can best satisfy the duty of loyalty by terminating the relationship with one or the other party. Principles of Corporate Governance, *supra* at § 5.05 comment a.

We conclude that the assets and liabilities of Doric Development and 231 Realty (and of Northland, now a part of Market Basket) are subject to the remedy ordered in favor of DSM and Valley.[48]

### V. Liability of Individual Defendants.

Having concluded that the corporate opportunities and assets of DSM and Valley were diverted to the benefit of the other defendants, the judge ordered, as part of the judgment, that (1) the assets and liabilities of the defendant businesses Market Basket, Doric Development, and 231 Realty be transferred to DSM and Valley; (2) the proceeds of the sale of Lee Drug be paid to DSM; and (3) the individual defendants (Telemachus, Arthur T., Irene, Frances, Caren, and Glorianne) pay to DSM any cash distributions they had received from the defendant businesses, and cancel promissory notes issued to them as distributions from Market Basket. We agree with the judge that the business and individual defendants must return the benefits that they have received as a result of the wrongs done to DSM and Valley.

---

[48]The defendants argue that it was illogical for the trial judge to order that just one parcel be transferred to Valley, and the rest to DSM. The judge appears to have decided that, where the development of a parcel was a corporate opportunity for both DSM and Valley, it was more equitable to transfer parcels to DSM, which was involved in much of the real estate financing. (The parcel that was returned to Valley, identified as "Stratham #26," was the only parcel that had been transferred directly from Valley.) "It is a well settled principle that, in fashioning appropriate relief, the issuance and scope of equitable relief rests within the sound discretion of the judge . . . who may phrase the court's order so as to afford a full, complete remedy" (citations omitted). *Johnson* v. *Martignetti*, 374 Mass. 784, 794 (1978). The absence of a clear-cut choice is certainly no reason to leave the parcels in the hands of the usurpers of the opportunities.

The judge established the liability of the various defendants on a number of legal theories. It is not necessary to consider all the judge's rulings to arrive at our decision, and we here detail the reasoning that we have followed in the case of each defendant.

As directors and officers of DSM and Valley, Telemachus and Arthur T. owed a fiduciary duty, which they violated by diverting the corporate opportunities already described. Having so acted, they became personally liable for the profits diverted from the corporation or the benefits represented by those opportunities. A director who breaches his duties in this fashion may not himself be unjustly enriched, and he is personally liable even where the profits or benefits accrue to a third party, whether or not it is under the control of the director. *Durfee* v. *Durfee & Canning, Inc.*, 323 Mass. 187, 196-197 (1948). It was therefore well within the judge's authority to order Telemachus and Arthur T. to repay the profits which they themselves derived from their actions. These profits include their ownership interests in Market Basket and the real estate companies, all of whose holdings reflect corporate opportunities that rightfully belonged to DSM and Valley. Rather than ordering these two defendants and the others with interests in those companies, to turn back their shares in those companies to DSM and Valley, the judge instead ordered the transfer of the companies' assets and liabilities. This was an appropriate remedy, because the companies, as the recipients of property transferred by fiduciaries in violation of their duty to their beneficiaries, hold that property on a constructive trust for the beneficiaries, namely, DSM and Valley. Restatement of Restitution § 201 (1937). As will be discussed later in this opinion, a constructive trust is not imposed where a recipient has given value or had no notice of the violation of duty. Here, however, either Telemachus or Arthur T. was a controlling director of the receiving companies, which had notice of the violations of duty.

Irene stands in much the same position as Telemachus and Arthur T. She was a director of DSM and committed a breach of her fiduciary duty to that corporation by acquiring stock in Market Basket at a time when it was a corporate opportunity for DSM. She was also a director and shareholder of Northland Properties, and thereby profited from the real estate

development and ownership ventures that were diverted from
DSM and Valley. By so doing, she again violated her fidu-
ciary duties to DSM.[49] The assets and liabilities of Northland
were therefore subject to a constructive trust in favor of DSM
and Valley, and, when Northland was merged into Market
Basket, those assets remained subject to the trust. The North-
land assets are thus accounted for in the judge's order that
Market Basket's assets and liabilities be turned over to DSM
and Valley.[50]

Frances, Caren, and Glorianne, the other members of
Telemachus's family against whom judgment entered, were
neither officers nor directors of DSM and Valley, and so can-
not be held directly liable for a breach of fiduciary duty on
precisely the same basis as Telemachus, Arthur T., and Irene.
The judge followed three theories, each of which, she found,
provided an independent basis for making these defendants li-
able for the diverted opportunities, or for otherwise imposing
a constructive trust on their gains. Under the first theory, the
judge found that Frances, Caren, and Glorianne belonged to
a "controlling group" of shareholders in a close corporation
and therefore had fiduciary duties to the corporation and to
minority shareholders. Their duties were equivalent to those
of a director or officer, in spite of their actual nonparticipa-
tion in the corporation's management and operation. See
*Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, 367
Mass. 578, 593, 597 (1975); Principles of Corporate Gover-
nance, *supra* at § 1.09; 12B W. Fletcher, Law of Private

[49]The defendants argue that the judge failed to distinguish between DSM
and Valley in considering which real estate opportunities were diverted
from one and which from the other. This is immaterial to assessing Irene's
actions as a simultaneous director of DSM and Northland. Her breach of
duty to DSM occurred not only when Northland took over properties
initially owned or scheduled for development by DSM, but also when she
failed to ensure that other real estate opportunities presented to Northland
were offered first to DSM. Thus, properties that were first owned by Valley
and were then sold to Northland at unfairly low prices represented op-
portunities diverted both from Valley *and* from DSM.

[50]As was the case with Telemachus and Arthur T., the judge could have
ordered Irene, as a remedy for her breach of fiduciary duty to DSM, to
turn over to DSM her shares in Market Basket, including those she acquired
from Frances as well as those received in exchange for her interest in
Northland. The judge instead exercised her discretion in arriving at an ap-
propriate equitable remedy and achieved an equivalent result by ordering
Market Basket to turn over its assets and liabilities to DSM and Valley.

Corporations § 5765 (rev. perm. ed. 1993). On this basis, the judge held them directly liable, as fiduciaries, for the diversions of corporate opportunities and assets from DSM and Valley. Second, the judge held that even if the three were not directly liable as fiduciaries, they were jointly liable under a theory of aiding and abetting, for their knowledge of, and active participation in, the breaches of fiduciary duty by Telemachus and Arthur T. See *Spinner* v. *Nutt*, 417 Mass. 549, 556-557 (1994); *Augat, Inc.* v. *Aegis, Inc.*, 409 Mass. 165, 172-173 (1991), *S.C.*, 417 Mass. 484 (1994); *Kyte* v. *Philip Morris Inc.*, 408 Mass. 162, 166-169 (1990); *Barden Cream & Milk Co.* v. *Mooney*, 305 Mass. 545, 546-547 (1940); *Stock* v. *Fife*, 13 Mass. App. Ct. 75, 82 n.10 (1982). Third, the judge held that, regardless of any direct involvement on their part in Arthur T.'s and Telemachus's breaches of fiduciary duty, the interests of the three remaining defendants in the benefited companies (and any distributions made to them from those sources) arose from a wrongful transfer of property held in trust by a fiduciary and were subject to the application of constructive trust principles, in view of the inability of the three defendants to establish that they were bona fide purchasers of their interests. See Restatement of Restitution, *supra* at § 201; Restatement (Second) of Trusts § 284 (1959); 4 Scott, Trusts § 284 (4th ed. 1994); 5 Scott, Trusts § 506 (4th ed. 1994).

The third theory advanced by the judge, according to which she denied bona fide purchaser status to Frances, Caren, and Glorianne, provides sufficient support in fact and law for applying constructive trust principles to any benefits that they derived from their ownership interests in Market Basket, Lee Drug, Doric Development, and 231 Realty, and thus for upholding the amended judgment against these three defendants. Therefore, we shall not address further the validity of the other two theories advanced by the judge or their applicability to the facts of this case.

These three defendants' assertions of bona fide purchaser status for the acquisition of their stock and partnership interests in Market Basket, Lee Drug, 231 Realty, and Doric Development are appropriately considered under the principles set forth in art. 8 of the Uniform Commercial Code (Code), i.e., investment securities, and other Code provisions. See G. L. c. 106. A "bona fide purchaser" is defined therein as "a purchaser for value in good faith and without notice of

any adverse claim." G. L. c. 106, § 8-302 (1). Each of the terms contained in this definition is itself defined elsewhere in G. L. c. 106 as follows.

A "[p]urchase" is any voluntary transaction creating an interest in property, including (among others) a sale or issue. G. L. c. 106, § 1-201 (32). That subsection also includes "gift" as coming within the definition of purchase, but one who receives a gift obtains the property without consideration, and thereby has not given value and will not be a bona fide purchaser. See *Otis* v. *Otis*, 167 Mass. 245, 246 (1897) (constructive trust imposed on persons who receive funds from trustee without giving consideration, whether or not they had notice of the trust); Restatement (Second) of Trusts § 289 (1959).

A person gives "[v]alue" for rights if he acquires them "in return for any consideration sufficient to support a simple contract." G. L. c. 106, § 1-201 (44) (*d*). An exception exists for negotiable instruments, where a holder takes an instrument for value "to the extent that the agreed consideration has been *performed*" (emphasis added). G. L. c. 106, § 3-303 (*a*). See *New Bedford Inst. for Sav.* v. *Gildroy*, 36 Mass. App. Ct. 647, 652 (1994) (bank's deposit of loan proceeds into company account in return for note constituted performance of consideration).

"Good faith" means "honesty in fact in the conduct or transaction concerned." G. L. c. 106, § 1-201 (19). Good faith is to be determined by a subjective standard: what is required to establish good faith is an honest conviction or belief as to the legitimacy of the transaction, not the exercise of due care or the observance of reasonable commercial standards. See *Dion* v. *Silver City Dodge, Inc.*, 398 Mass. 58, 60 (1986); *Industrial Nat'l Bank* v. *Leo's Used Car Exch., Inc.*, 362 Mass. 797, 801-802 (1973) *New Bedford Inst. for Sav.*, *supra* at 652.

"A person has 'notice' of a fact when (*a*) he has actual knowledge of it; or (*b*) he has received a notice or notification of it; or (*c*) from all the facts and circumstances known to him at the time in question he has reason to know that it exists. A person 'knows' or has 'knowledge' of a fact when he has actual knowledge of it. 'Discover' or 'learn' or a word or phrase of similar import refers to knowledge rather than to reason to know." G. L. c. 106, § 1-201 (25). Accordingly, no-

tice is determined by a standard that is objective in part, because actual knowledge of certain facts and circumstances may provide reason to know of another fact. In the case of investments, mere notice that one is dealing with a fiduciary does not create a duty of inquiry, but knowledge that the transaction is for the benefit of the fiduciary, or otherwise is a breach of duty, does charge the purchaser with notice of an adverse claim. G. L. c. 106, § 8-304 (3). See *Michelin Tires (Can.) Ltd.* v. *First Nat'l Bank,* 666 F.2d 673, 682 (1st Cir. 1981) (under Massachusetts law, person has notice of fact when, from all the information at his disposal, he has reason to know of it); *Higgins* v. *Shenango Pottery Co.,* 256 F.2d 504, 510 (3d Cir. 1958) (under Pennsylvania law, where corporate directors diverted opportunity to partnership, other partners had knowledge of fiduciary relation, and extraordinary circumstances imposed compelling duty of inquiry). The fact that property has been obtained for a payment substantially less than the property's real value may in itself give reason to know of some wrongdoing, and thereby establish notice of an adverse claim. See *Kanall* v. *318 Lounge, Inc.,* 1 Mass. App. Ct. 5, 8 (1972); Restatement (Second) of Trusts, *supra* at § 297 & comment i, at 78, § 298; 4 Scott, Trusts, *supra* at § 298.4.

"Adverse claim" is defined as "a claim that a transfer was or would be unauthorized or wrongful or that a particular adverse person is the owner of or has an interest in the security." G. L. c. 106, § 8-302 (2). The definition applies to a claim by a beneficial owner that a security has been, or is proposed to be transferred in breach of trust. 2C U.L.A. § 8-302 (2) official comment no. 4 at 357 (Master ed. 1991).

The judge ruled correctly that the defendants bore the burden of proof (meaning the burden of persuasion) in establishing their status as bona fide purchasers. Their claim to this status was an affirmative defense to the plaintiff's proven assertion that the diversion of corporate opportunities and assets caused the defendants (and the entities in which they held interests) to be charged with a constructive trust on behalf of DSM and Valley. Massachusetts case law, as well as statutory language, support this assignment of the burden. See *George* v. *Coolidge Bank & Trust Co.,* 360 Mass. 635, 639 (1971) (possessor of negotiable instrument, whether commercial paper or investment securities, would have burden of

establishing status under the Uniform Commercial Code as holder in due course or purchaser for value without notice); *Elbar Realty, Inc.* v. *City Bank & Trust Co.*, 342 Mass. 262, 267-268 (1961) (whether or not holder is plaintiff or defendant, when opponent has established existence of title defect, holder has ultimate burden of proof that it was holder in due course); *New England Merchants Nat'l Bank* v. *Old Colony Trust Co.*, 11 Mass. App. Ct. 539, 545 (1981), *S.C.*, 385 Mass. 24 (1982) (estate administrator seeking distribution failed to sustain burden of establishing that his decedent was purchaser for value and without notice that payment had been made to shareholder of record); G. L. c. 106, § 8-105 (3) (if existence of defense or defect to validity of security is shown, burden is on security holder to show that he is person against whom defense or defect is ineffective); 2 U.L.A. § 3-307 (3) official comment no. 3 at 641 (Master ed. 1991) (when defense shown to exist, person seeking to cut off defense has full burden of proof to establish, by preponderance of evidence, that instrument was taken for value, in good faith, and without notice); P.J. Liacos, Massachusetts Evidence §§ 5.1, 5.4.1-5.4.3 (6th ed. 1994). See also *Bowling Green, Inc. of Somersworth, N.H.* v. *State St. Bank & Trust Co.*, 307 F. Supp. 648, 653 n.4 (D. Mass. 1969), aff'd, 425 F.2d 81, 83 (1st Cir. 1970) (G. L. c. 106, § 3-307 [3], requires party resisting claim to instrument on ground of "holder in due course status" to prove status as affirmative defense).[51]

We turn, then, to determining whether these three

---

[51]In their proposed rulings of law, the defendants cited several cases in support of their position that the burden of proof rests with the party seeking to disprove bona fide purchaser status. See, e.g., *Richardson* v. *Lee Realty Corp.*, 364 Mass. 632, 634 (1974); *Mucci* v. *Brockton Bocce Club, Inc.*, 19 Mass. App. Ct. 155, 158 (1985). These cases involve real property title disputes, where the rule is that the party claiming under an unrecorded deed must prove that the subsequent purchaser had actual knowledge or notice of such a deed. *Hughes* v. *Williams*, 229 Mass. 467, 470-471 (1918). In another case cited by the defendants, the Appeals Court quoted the trial judge's statement that the plaintiff, who challenged a transfer of stock as violating a prenuptial agreement, had failed to meet her burden of proof in establishing that the recipient was not a bona fide purchaser. The Appeals Court's decision, apparently in response to the plaintiff's appellate argument, addressed the merits of the case and not the issue of burden of proof. *Kanall* v. *318 Lounge, Inc.*, 1 Mass. App. Ct. 5, 7-8 (1972). The cases cited by the defendants do not dissuade us from concluding that, except in the case of real property, the burden of proof rests with the person claiming the status of a bona fide purchaser.

defendants have proved their status as bona fide purchasers of their ownership interests.

A. *Lee Drug.* When Lee Drug was incorporated in 1983, its sole shareholder was Doric Distributors, Inc., whose shareholders were Arthur T., Frances, Glorianne, and Caren. The judge found no evidence that the shareholders of Doric Distributors paid anything for their stock. On December 23, 1986, all the outstanding stock of Lee Drug (1,000 shares) was transferred to Arthur T. from Doric Distributors. Doric Distributors was then merged into Lee Drug. The next day, Arthur T. made a gift of 300 shares of Lee Drug to his wife, Maureen, and fifty shares to each of Frances, Caren, and Glorianne. Lee Drug was sold to Walgreen Eastern Company, Inc., pursuant to a purchase and sale agreement dated September 7, 1990. The proceeds from that sale have been held in escrow, pending the outcome of this suit.

As has been discussed, Lee Drug was a corporate opportunity diverted from DSM, in breach of Arthur T.'s fiduciary duties to DSM. Frances, Caren, and Glorianne held their interests in Lee Drug for the benefit of DSM, unless they could prove their status as bona fide purchasers. Whether their interests in Lee Drug are considered as arising from their initial shares in Doric Distributors or from the shares in Lee Drug transferred as gifts to them by Arthur T. following the 1986 merger, there is no evidence that they paid any value for these interests. They lack the status of bona fide purchasers with respect to Lee Drug, and the judge properly determined that the proceeds from the sale of Lee Drug are held in constructive trust for DSM.

B. *Market Basket.* Frances was the sole shareholder in P&P Foods, which was formed in 1978, acquired Market Basket (formerly Seabrook Sales) as a subsidiary in 1981, and became known as Market Basket itself after the merger of the two corporations in 1983. Frances's claim to be a bona fide purchaser of her interest in Market Basket must be analyzed separately, then, from the claims of Caren and Glorianne, who did not become shareholders of Market Basket until 1986.[52]

Frances's claim to be a bona fide purchaser fails to meet all

---

[52]Although the judge did conclude that Frances was not a good faith purchaser of her stock in Market Basket, she did not indicate specifically which findings of fact were the basis for this conclusion. (The judge focused

the criteria previously set forth. She did give value for her stock in P&P Foods by investing $50,000 in the company at the time of its formation.[53] Nonetheless, the accretions to the net value of the company over the course of its history can hardly be attributed to the impact of her investment. Rather, they arise from the opportunities and assets diverted from DSM, and the financing and management services provided by DSM.[54] Nor can the growth of Market Basket be credited to personal effort by Frances, who was clearly a passive investor who was uninvolved in the company's management, except on paper. The fact that Frances did pay some value for her stock does not shield her from the imposition of a constructive trust to prevent unjust enrichment, although it will affect the computation of the amount due in restitution. See 4 Scott, Trusts § 291.5 (4th ed. 1989) (person required to return property is entitled to credit on purchase price, to avoid "double satisfaction" to beneficiary). Additionally, we reject as did the judge, Frances's assertions that she acted in good faith and lacked notice of an adverse claim. The judge found that her testimony concerning P&P Foods was not credible. Her claim to an honest belief in the legitimacy of the transaction, *Dion* v. *Silver City Dodge, Inc.*, 398 Mass. 58, 60, 62 (1986), is undercut by the circumstances of P&P Foods's formation and operation, including the purported sale of her DSM stock to Arthur T.,[55] the failure to disclose DSM's management role on the application for a New Hampshire beer sales permit, and the control of P&P Foods's operations by DSM personnel. Furthermore, Frances's knowledge of Arthur T.'s fiduciary duties to DSM, coupled with the fact that

instead on establishing Frances's liability to DSM arising from the alternative "control group" and "aiding and abetting" theories.) "We may reach our own ultimate conclusions based on the trial judge's subsidiary findings." *Delano Growers' Coop. Winery* v. *Supreme Wine Co.*, 393 Mass. 666, 684 (1985).

[53]This sum was obtained through a bank loan to Frances. The plaintiff has not challenged Frances's assertion that this represented an investment of her own funds.

[54]In its first five years, P&P Foods had profits of $1,780,000, or thirty-five times Frances's original investment.

[55]The "sale" was, as the judge described it, "a wash." In 1978, Arthur T. gave Frances a promissory note in exchange for her DSM stock (the note remained in the custody of DSM's lawyer); no interest payments were ever made on the note, and when Frances reacquired the stock in 1986, she did so for the amount of the note.

the profits generated by P&P Foods were disproportionate to the amount of her investment, gave her "reason to know," G. L. c. 106, § 1-201 (25), that the transaction might be wrongful and constitute a breach of trust. See *Banks* v. *Everett Nat'l Bank*, 305 Mass. 178, 182-183 (1940) (bank not liable for improper transfer of funds, where it neither knew of breach nor had knowledge of such facts that it could not reasonably be held to have acted in good faith[56]); *Higgins* v. *Shenango Pottery Co.*, 256 F.2d 504, 510 (3d Cir. 1958); Restatement (Second) of Trusts, *supra* at §§ 296-298.

Caren and Glorianne acquired their interests in Market Basket in 1986, as nominees of Arthur T., when he and Frances exercised the options that permitted Frances to reacquire her shares in DSM and Arthur T. to purchase her shares in Market Basket. The judge ruled that Caren and Glorianne were not bona fide purchasers because they did not act in good faith and because they were on notice of an adverse claim concerning the ownership of Market Basket. (The judge did not address whether Caren and Glorianne had given value for their shares.)

As the factual basis for her ruling on good faith, the judge found that the two sisters were familiar with the fiduciary duties of corporate directors, knew that Arthur T. owed such a duty to DSM, knew of the "symbiotic relationship" between DSM and Market Basket under which DSM operated Market Basket's stores, knew that they were acquiring their shares as Arthur T.'s nominees, and knew that assets and opportunities were being diverted from DSM to entities controlled by their own family. The sisters testified that they did not think Arthur T. was committing breaches of his fiduciary duty, but the judge did not find that testimony to be credible. From her findings, the judge found, as a reasonable inference, that Caren and Glorianne had not acted with honesty and had not truly believed that their purchase of Market Basket shares was proper. Instead, the judge concluded, they knew that Arthur T. was committing violations of his fiduciary

[56]The wording of the predecessor statute to G. L. c. 106, §§ 3-302 (1), and 1-202 (25), linked the concepts of notice and good faith: "To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith." G. L. c. 107, § 79, repealed by St. 1957, c. 765, § 2.

duty by not making his option to purchase Frances's shares available to DSM. As for notice, the judge found that knowledge of these facts amounted to "actual notice"[57] of an adverse claim and gave the defendants "reason to know" that an adverse claim existed.

Even if Caren and Glorianne knew the responsibilities of a corporate fiduciary such as Arthur T., and knew, as participants, the details of the disposition of Frances's shares in Market Basket, what is crucial to the determination of good faith is whether they realized, as a subjective matter, that this transaction was undertaken in breach of Arthur T.'s fiduciary duties. Disbelieving their assertions to the contrary, the judge found, as a reasonable inference, that Caren and Glorianne did not act in a good faith belief that the transaction was proper. As has been discussed, a judge's findings of fact will not be set aside unless clearly erroneous, and it is recognized that the judge is in the best position to judge the credibility of the witnesses. Where a conclusion is so dependent on an assessment of witness credibility, and is based on what we consider to be a reasonable inference, we defer to the judge's finding. We therefore conclude that Caren and Glorianne did not act in good faith when they acquired their Market Basket shares. Even if we were to accept their claim of good faith, we would disallow their status as bona fide purchasers on the basis of notice. Whether or not they had "actual knowledge" of the fact that the transaction was a breach of fiduciary duty, they certainly had "reason to know" of the impropriety of the transaction, "from all the facts and circumstances known" to them. G. L. c. 106, § 1-201 (25). In addition to those facts found by the judge, we note that the price paid by Caren and Glorianne for their shares was a small fraction of the actual per-share value of Market Basket.[58] This great discrepancy between the purchase price and the value of the acquisition in itself gave them reason to know of wrongdoing by the trans-

---

[57]The judge's statement of the law was imprecise: the term "actual notice" does not appear in G. L. c. 106, § 1-201 (25). For reasons we shall discuss subsequently, we nonetheless reach the same conclusion as the judge, that Caren and Glorianne did not prove that they had acquired their stock without notice of an adverse claim, and they therefore were not bona fide purchasers.

[58]At a per-share price of $600, the price to purchase all of Frances's 300 shares would have been $180,000. As of March, 1986, Market Basket had retained earnings of over $12.6 million, and as of December 30, 1986, Mar-

feror and thereby put them on notice of an adverse claim. See *Kanall* v. *318 Lounge, Inc.*, 1 Mass. App. Ct. 5, 8 (1972); Restatement (Second) of Trusts, *supra* at §§ 297-298; 4 Scott, Trusts, *supra* at § 298.4.

C. *Doric Development*. Doric Development was incorporated in 1981, with Caren as sole officer, director, and shareholder; Caren paid $5,000 for 1,000 shares of stock. Doric, however, was inactive until 1985. At that time, Arthur T., Frances, and Glorianne each "subscribed" for 1,000 shares at a stated cost of $5,000. Arthur T. became president and treasurer, while Frances, Caren, and Glorianne became directors. Thereafter, as has been discussed, Doric profited from real estate development opportunities that rightfully belonged to DSM and Valley and was able to acquire properties for below-market prices.

The judge concluded that Caren, Frances, and Glorianne all had notice of adverse claims by DSM and Valley, and were not bona fide purchasers. The judge did not specify which findings of fact formed the basis of her conclusion, but we arrive at the same conclusion from our own review of her findings. These three defendants knew of Arthur T.'s fiduciary duties to DSM and Valley and knew that those corporations were already involved in acquiring and developing real estate sites. These facts, considered with the circumstance that they were themselves directors of Doric, and thus directly involved with Arthur T. in the management of that company, gave them ample reason to know, and hence notice, that the transactions from which it profited were violations of Arthur T.'s duties.[59]

Arthur T.'s position as Doric's president meant that Doric was on notice of the wrongful diversion of opportunities and assets from DSM and Valley. G. L. c. 106, § 1-201 (25), (27), (28) & (30) (defining notice to an organization). Thus, Doric itself could not be a bona fide purchaser, and its profits from

---

ket Basket (according to the valuation accepted by the judge) was worth $144 million.

[59]As we are satisfied that these three defendants had notice of adverse claims, we need not consider the judge's additional conclusion that Frances and Glorianne never actually paid for their stock, and that merely "subscribing" without paying money does not constitute the giving of value. See Restatement (Second) of Trusts § 302 (1959); 4 Scott, Trusts § 302, at 150 (4th ed. 1989) (performance of promise is the giving of value).

the wrongful transactions are subject to a constructive trust on behalf of DSM and Valley. The cash distributions made to Doric's four shareholders in 1991 and 1994 are also subject to a constructive trust. As directors who approved the distributions at a time when this suit had already commenced, Caren, Frances, and Glorianne had ample reason to know that the payouts of the assets were wrongful.

D. *231 Realty.* Frances, Caren, and Glorianne are partners in 231 Realty with Arthur T. The partnership was formed in 1985. As with Doric Development, the judge found that Frances, Caren, and Glorianne had notice of the adverse claims of ownership by DSM and Valley. In addition, the judge found that none of the three had paid any value for their interests in 231 Realty. The judge concluded that all three lacked the status of bona fide purchasers of those interests. We agree with this conclusion on the basis of the reasoning that we have applied to Doric Development. Additionally, we note that 231 Realty's status as a partnership means that Arthur T.'s knowledge that he was committing a breach of his duties to DSM and Valley operates as notice to or knowledge of the partnership, and that the partnership is liable for his wrongful acts. See G. L. c. 108A, §§ 3, 12, 13. See also *Higgins* v. *Shenango Pottery Co.,* 256 F.2d 504, 509-510 (3d Cir. 1958) (under partnership and agency law, knowledge of one partner is imputed to all; partnership is liable for profits realized through breach of fiduciary duty by partners who were also officer-directors of injured corporation). Thus, 231 Realty's assets are to be held for the benefit of DSM and Valley, and the cash distributions made by 231 Realty to its partners in 1992, 1993, and 1994 remain subject to the relief ordered by the judge.

## VI. REMEDY.

Having identified the assets and opportunities that were wrongfully diverted from DSM and Valley, and having established the responsibility of the various defendants to account for their gains from these wrongs, we turn to the appropriateness of the remedies ordered by the judge. As has been explained, the judge ordered (1) the transfer to DSM and Valley of the assets and liabilities of Market Basket, Doric Development, and 231 Realty, as well as the proceeds held in escrow from the sale of Lee Drug; (2) the payment to

DSM and Valley of all cash distributions made to the individual defendants by the business entities, and the cancellation of promissory notes issued to the individuals by those companies; (3) the payment of interest on those cash distributions; (4) the repayment of any attorney's fees and costs paid on the individual defendants' behalf by the defendant companies; and (5) the payment of the plaintiff's attorney's fees and costs. The judge was correct in choosing to base these remedies on the principle of preventing unjust enrichment. However, some revision of the ordered relief is necessary to ensure that the defendants are not being required to repay more than their actual gains. In particular, the defendants should be given credit for any investments that they have personally made in the affected companies and for any taxes on those companies' profits that they were required to pay. The defendants bear the burden of proving that they are entitled to such credits. We also conclude that D. Harold Sullivan should be dismissed from the case and should not be required to repay amounts that he received for legal expenses. We remand the case solely for these modifications to the judge's order.

Where a corporate fiduciary obtains a gain or advantage through a violation of his duty of loyalty, a court may properly order restitution of the gain, so as to deny any profit to the wrongdoer and prevent his unjust enrichment. See *Broomfield* v. *Kosow*, 349 Mass. 749, 758 (1965); *Production Mach. Co.* v. *Howe*, 327 Mass. 372, 377-378 (1951); *Durfee* v. *Durfee & Canning, Inc.*, 323 Mass. 187, 198 (1948). As has been discussed, a constructive trust is also imposed on gains transferred to recipients who cannot prove that they are bona fide purchasers. In this case, the judge appropriately sought to achieve restitution by rescission of the transactions and disgorgement of the gains. Restatement of Restitution §§ 1, 160, 201 (1937); Restatement (Second) of Trusts § 291 (1) (a) comment a (1959).

The defendants argue that certain amounts should have been excluded from the transfers and repayments ordered by the judge. They contend also that interest should not have been charged on the defendants' cash distributions. They object, as well, to the procedure followed by the judge in arriving at her order and complain that they were not afforded

a fair opportunity to present their arguments as to appropriate remedies. We now address their principal concerns.[60]

A. *The defendants' investments in the affected companies.* The defendants argue that the order to transfer all assets and liabilities of Market Basket, Doric Development, and 231 Realty is unfair, because it does not provide a deduction for amounts that the defendants personally invested in these companies, either at the time that any stock was issued or on later occasions. The defendants claim that millions of dollars are at stake. The plaintiff argues that the defendants failed to introduce any evidence at trial to substantiate these claims. As matter of law, the defendants are entitled to a credit for amounts which they personally invested in the companies (assuming, of course, that those funds are not themselves traceable to the violations of fiduciary duties towards DSM and Valley). DSM and Valley are entitled to receive all gains and profits that are attributable to the diversions of corporate assets and opportunities (including additional growth in assets arising from the reinvestment of company profits), but not the portions of the companies' valuations that have a different source. See Restatement (Second) of Trusts, *supra* at § 291 (3) (transferee who is required to repay value of property received in breach of trust, is entitled to credit for amount he paid for property). See also *Lang* v. *Giraudo,* 311 Mass. 132, 139-141 (1942) (defendant must return fraudulently obtained real property, but is to be credited for tax and mortgage payments and costs of necessary repairs). The purpose for this credit is to prevent an injured plaintiff from receiving more than the amount by which the defendant had benefited from the wrongful transaction. Determining the amounts to be credited in this case is a factual issue for the judge to resolve on remand. The burden of proof is on the defendants to show

---

[60]Two additional issues raised by the defendants merit only brief discussion. First, the defendants argue that Maureen Demoulas, who is a shareholder of Lee Drug but a nonparty in this case, should not be deprived of her interest in the sale proceeds of Lee Drug. The amended judgment does not affect her ownership of *stock,* but rather the assets of Lee Drug itself, which (as has been stated) are subject to a constructive trust. We see no basis for modifying the disposition of the sale proceeds. Second, the defendants argue that the judge erred in denying a motion by Antonios Katsikas to intervene, and a related motion by the defendants to join Katsikas as a party. These untimely motions were made after the judgment had already been entered, and the judge properly denied them.

how much of any entity's assets are not the direct or indirect result of the violations of fiduciary duty. See *Jet Spray Cooler, Inc.* v. *Crampton*, 377 Mass. 159, 174 n.14 (1979) (burden on defendants to show portion of profits not attributable to misappropriated trade secrets).

B. *Deduction for payments of Federal and State income taxes.* Market Basket and Doric Development are Subchapter S corporations; 231 Realty is a partnership. Under Federal and State tax law, the earnings of those three entities are treated as having been "passed through" to their shareholders or partners (whether or not distributions were actually made), and those persons are responsible for the resulting tax obligations. See 26 U.S.C. §§ 701-761, 1361-1379; G. L. c. 62, §§ 17, 17A. The defendants argue that they should be allowed to deduct their tax payments from the cash distribution repayments that were ordered by the judge. In other words, they contend that, although the judge ordered them to repay the entire amount of the distributions, their actual "gain" was only the net amount of the distributions, namely the portion that they retained after the payment of taxes. This is a logical position: the objective in addressing unjust enrichment is to recover simply the amount derived from the wrongdoing. *USM Corp.* v. *Marson Fastener Corp.*, 392 Mass. 334, 338-339 (1984). Where a corporate opportunity has been wrongfully diverted or a trade secret misappropriated, we have required the transgressor to repay only net profits, not the gross income from sales. See, e.g., *Jet Spray Cooler, supra*; *Durfee, supra* at 203-204. We have stated that "[t]axes . . . are as much a proper allowance against the gross profit as is any other cost obligation incurred in generating that profit." *USM Corp., supra* at 343.[61] We have recognized that, where such a deduction is allowed for taxes, it will be necessary to track any tax benefits received by a defendant resulting from repayments made to a plaintiff, and to ensure that those tax benefits are also transferred to the plaintiff. Otherwise, unjust enrichment would still occur. *Id.* at 346-347. On remand, the

---

[61]We note that the Federal courts have tended to follow a different policy in trade secret and other intellectual property cases, allowing deductions for production costs but not for taxes. See *L.P. Larson, Jr., Co.* v. *Wm. Wrigley, Jr. Co.*, 277 U.S. 97, 100 (1928); *USM Corp.* v. *Marson Fastener Corp.*, 392 Mass. 334, 344-347 (1984) (discussing cases from Federal and other State courts).

defendants have the responsibility for documenting and proving their claims to tax deductions and proposing a workable method of preventing further unjust enrichment.[62]

C. *Interest on cash distributions.* In the amended judgment, the judge ordered the defendants to pay interest at a rate of six per cent on the cash distributions, from the date of each distribution to the date that restitution is made.[63] The judge's decision to award interest was well within her power to frame the relief so as to avoid unjust enrichment. *Samia* v. *Central Oil Co. of Worcester*, 339 Mass. 101, 125 (1959). The defendants have had the opportunity to earn a return on the cash distributions made to them. The interest charge represents a fair attempt to recapture that return and prevent unjust enrichment. Stated another way, if the funds had not been distributed, any return on those funds would now be among the business assets and liabilities that are also subject to the judge's order of restitution, so it is proper to reclaim those returns from the individual defendants. See *Broomfield* v. *Kosow*, 349 Mass. 749, 759 (1965) (constructive trustee to pay interest on wrongfully held funds from date that notes were issued); *Crosby* v. *Simpson*, 234 Mass. 568, 576 (1920) (defendant must return stock plus cash dividends received during period stock held); Restatement (Second) of Trusts § 291 (1) (a) (1959) (constructive trustee must return property, together with income received from it).[64]

D. *Procedural objections.* The judge's orders were included

---

[62]We have rejected claims for tax deductions in instances where the wrongdoer (who is responsible for asserting this defense) has failed to present adequate evidence or has evinced noncooperation in the computation of the award. See *USM Corp.*, *supra* at 347-348; *Fidelity Mgt. & Research Co.* v. *Ostrander*, 40 Mass. App. Ct. 195, 201-202 (1996).

[63]The judge initially set the rate at twelve per cent, but in response to the defendants' motion to eliminate the interest charge, reduced the rate to six per cent. As a basis for the six per cent figure, the judge cited G. L. c. 107, § 3, which states in relevant part, "[i]f there is no agreement or provision of law for a different rate, the interest of money shall be at a rate of six dollars on each hundred for a year . . . ." The defendants' motion, and the judge's response, applied to interest charges on both the cash distributions and the payments of the defendants' attorney's fees. On appeal, the defendants have not argued against the interest charges on the payment of attorney's fees. The same logic applies to both outlays, and we consider the judge's decision appropriate in both instances.

[64]The cases cited by the defendants, in which interest was not awarded, are inapposite. At issue in those cases were interest charges on awards that

in the decision that contained her findings of fact and rulings of law. The defendants contend that, during the trial of the action, it had been their understanding that issues of relief would be dealt with separately after the judge had made rulings on liability. Instead, they argue, the judge entered the order concerning relief without giving them a fair opportunity to present evidence and arguments on the points that have been discussed in this section. The plaintiff argues, by contrast, that the defendants waived their rights to raise these issues on appeal by failing to present evidence on them during the course of the trial.

We shall not attempt to determine what the parties' expectations were during the course of this long, complicated, and highly contentious trial, as to the judge's intended procedures for addressing the topic of relief. As we have noted, the burden is on the defendants to prove their claims to credits for taxes paid and investments made. On remand, there should be an opportunity for both the defendants and the plaintiff to present evidence and arguments on these matters, so that the court can fashion the appropriate relief.

E. *D. Harold Sullivan.* The judge ordered that all individual defendants reimburse DSM and Valley for funds previously paid by any of the defendant companies to cover attorney's fees or expenses related to the defense of this case. The defendant D. Harold Sullivan appeals from this order insofar as it applies to his legal expenses, arguing that both DSM and Valley are obligated by contract to indemnify him under their by-laws and that nothing in the judge's findings relieves them of their obligations to pay his attorney's fees and costs. Sullivan also argues that the judge erred in refusing to grant his motion to dismiss, and that, because he is not a necessary or proper defendant in this action, he should have been dismissed from the case. We conclude that Sullivan should not have been required to reimburse the corporations for any attorney's fees or costs, and that he is not a proper party to this action and should have been dismissed.

---

were believed to exceed the defendants' actual profits. In the circumstances, the judges declined to award interest (in one instance, entirely, in another, for a portion of the period sought). See *USM Corp., supra* at 348-351; *Jet Spray Cooler, Inc.* v. *Crampton,* 377 Mass. 159, 181-184 (1979). In the present case, the interest charge appropriately offsets an obvious gain to the defendants.

1. *Indemnification.* Sullivan has served as vice-president, chief financial officer, and treasurer of DSM, and is a director of DSM and Valley. Because Sullivan is a director of these companies and an officer of DSM, his attorney's fees have been paid by the corporations.

General Laws c. 156B, § 67, authorizes a corporation to make provisions in its by-laws for the indemnification of "directors, officers, employees or other agents of a corporation," including the payment of expenses incurred in defending a civil action. If it so desires, the corporation may require in its by-laws that the indemnified individual reimburse the corporation for expenses if he is "adjudicated to be not entitled to indemnification under this section." Section 67 goes on to say that "[n]o indemnification shall be provided for any person with respect to any matter as to which he shall have been adjudicated in any proceeding not to have acted in good faith in the reasonable belief that his action was in the best interest of the corporation."

The by-laws of both DSM and Valley provide for such indemnification, but the precise language of each by-law differs slightly. The DSM by-laws indemnify directors or officers against all expenses reasonably incurred in connection with any civil suit to which the director has been made a party by reason of serving as a director, "provided that no indemnification shall be provided for any person with respect to any matter as to which he shall have been finally adjudicated . . . not to have acted in good faith in the reasonable belief that his action was in the best interest of the corporation." The DSM by-laws make no provision for refund of paid legal expenses on such an adjudication, but repayment would be implicitly required.[65] The Valley by-laws authorize substantially the same indemnification and exception, together with an express provision for the repayment of legal expenses if the director or officer is "adjudicated to be not entitled to indemnification under this article."[66] Under G. L. c. 156B, § 67, and under both the DSM and Valley by-laws, Sullivan would be required to repay any legal expenses paid by the corporations if he were adjudicated not to have acted in good faith.

Sullivan was never so adjudicated. As discussed below, his

[65] Amendment of by-laws of Demoulas Super Markets, Inc., art. thirteenth.

[66] Amendment of by-laws of Valley Properties, Inc., art. sixth.

inclusion in the lawsuit was predicated on the possibility that his cooperation would be required to effect the relief ordered. The plaintiff never alleged, and the judge did not expressly find, that Sullivan had violated his fiduciary duty or failed to act in the best interests of the corporation. Sullivan's activities were certainly suspect: in her findings of fact, the judge termed the seventeen-store transfer, in which Sullivan played a role, as "unfair," cited several instances where Sullivan's actions could be termed at least negligent, and found that some of his testimony was "not credible." However, DSM and Valley are required by their by-laws to indemnify Sullivan unless he has been "adjudicated" not to have acted in good faith. There was no such express finding by the judge. See *Dynan* v. *Fritz*, 400 Mass. 230, 246 (1987). The order of relief requiring Sullivan to refund his legal expenses is improper.

At trial, Sullivan was represented by the same counsel who represented the defendants Market Basket, Doric Development, and Lee Drug. The plaintiff argues that the portion of Sullivan's attorney's fees paid by these companies should be refunded to DSM and Valley. We find no record of whether these companies actually funded any of Sullivan's legal fees. There is no indication of the proportion of the counsel's fees that might have been incurred by Sullivan individually, as opposed to those attributable to these companies. On the evidence before us, we conclude that the judge's order should not have required Sullivan to reimburse DSM and Valley for any of his legal fees or other costs that had been paid for by the defendant companies.

2. *Dismissal.* Sullivan was originally included as a defendant in this case because he is a member of both the DSM and Valley boards of directors, and the plaintiff argued at trial that his cooperation was required to effect any relief that the court might order.

In a shareholder derivative suit, a director may be properly included as a defendant if misconduct is alleged against him, but an individual director who is not directly responsible for the wrongful conduct of other directors may be dismissed as a defendant. See *Spiegel* v. *Beacon Participations, Inc.*, 297 Mass. 398, 411, 434-435 (1937) (where facts fail to show breach of fiduciary duty, defendant directors can be dismissed from case). A director may also be a proper party in a shareholder derivative suit if the relief requested would

require his cooperation. See *Doherty* v. *Mutual Warehouse Co.*, 245 F.2d 609, 612 (5th Cir. 1957) (directors are proper parties in suit seeking declaration of dividends); *Swinton* v. *W.J. Bush & Co.*, 199 Misc. 321, 323-324 (N.Y. Sup. Ct.), aff'd, 278 A.D. 754 (N.Y. 1951) (directors are proper parties where decree directs them to act).

No substantive claim was brought against Sullivan by the plaintiff,[67] and Sullivan was not included in the defendants against whom judgment was entered at the close of trial. Thus, he cannot be included as a defendant on the grounds of any misconduct he may have committed. Furthermore, although the judge's order directed Sullivan to effect the transfer of all the assets and liabilities of Market Basket, Doric Development, and 231 Realty to DSM and Valley, Sullivan is not a director of Market Basket, Doric Development, or 231 Realty, and therefore he cannot take any affirmative steps to accomplish these transfers. The judge's order is therefore ineffective. We conclude that Sullivan should no longer be considered a defendant and should be dismissed from the case.[68]

## VII. CONTEMPT.

We come now to the separate but related action by the defendant DSM challenging a civil contempt judgment entered against it in Superior Court. In April, 1990, when the plaintiff and his family commenced the stock transfer and shareholder derivative actions, they also filed a motion for a temporary restraining order to enjoin the defendants DSM and Valley from transferring corporate assets or making any payments to the other defendants. In May, 1990, the defendants proposed, and the plaintiff and his family accepted, an agreement under which the plaintiff and his family withdrew their motion and the defendants agreed not to transfer any assets or pay any sum to any of the other defendants, their affiliates or family, except "in the ordinary course of business" or on proper no-

[67]Both plaintiff's counsel and the judge repeatedly acknowledged throughout the course of the trial that the judge had not been asked to find any liability against Sullivan.

[68]We note that another similarly situated defendant, James Curtis, was dismissed from the case before trial by agreement of the parties. Curtis was legal counsel to the Demoulas companies and a director of both Valley and DSM.

tice. In February, 1991, the plaintiff became aware that DSM had purchased from Market Basket, Inc., the assets of the Market Basket Produce division and, having concluded that this transaction was outside the ordinary course of business, he then filed a motion for a preliminary injunction, seeking to convert the agreement between the parties into an order of the court. After a hearing, a judge in the Superior Court determined that DSM had violated the agreement, and in March, 1991, a preliminary injunction was entered that incorporated the language of the agreement and enjoined DSM from transferring any assets or paying any sum to any of the other defendants, their affiliates or family, except "in the ordinary course of business" or on proper written notice.[69] DSM is a Subchapter S corporation under 26 U.S.C. § 1362 (1994), and uses the pass-through method of distributing earnings to its shareholders. In the fiscal years 1989, 1990, and 1991, the directors of DSM voted to distribute to its shareholders a portion of its corporate earnings sufficient for each to pay his or her Subchapter S taxes. The DSM directors voted to retain the remainder of the earnings to fund possible future expansion.

In December, 1991, DSM issued promissory notes to its shareholders for the undistributed earnings from 1989, 1990, and 1991, totalling $68.5 million. The notes had maturity dates beginning in December, 1996. Between October 1, 1992, and December 11, 1992, DSM directors voted to prepay these promissory notes together with accrued interest. In January, 1993, the plaintiff filed a civil contempt action charging DSM with violating the terms of the preliminary injunction. After a hearing, another Superior Court judge determined that DSM had violated the preliminary injunction by prepaying the

---

[69]The injunction prohibited DSM from:

"transferring any assets to any of the other defendants or their affiliates or family members and from paying any sum to any of the other defendants or their affiliates or family members except (I) in the ordinary course of business (ii) or upon ten days prior written notice hand-delivered to the plaintiff, identifying the assets proposed to be transferred out of the ordinary course of business, or payment proposed to be made out of the ordinary course of business; the proposed transferee or payee, the consideration for such transfer or payment and the purpose of such transfer or payment."

promissory notes, thereby "dissipat[ing] the available assets intended to be preserved by the [previous court] order." The judge ordered DSM (1) to pay the costs and attorney's fees incurred by the plaintiff in bringing the contempt action, and (2) to hold the sum of $68.5 million in escrow for distribution after the final resolution of the litigation between the parties or until further order of court.

DSM challenged the contempt judgment in two motions that were denied. DSM then appealed. We granted DSM's application for direct appellate review and consolidated the appeal with the appeal in the principal case. In its appeal, DSM contends that the contempt judgment was in error because, as matter of law, (1) the injunction did not constitute a clear and unequivocal command prohibiting the issuance and prepayment of the promissory notes, and (2) the evidence was insufficient to show a clear and undoubted disobedience of the court's order. DSM also argues that the plaintiff should have been precluded from challenging the prepayment of the promissory notes by the doctrine of laches because he had received, read, and understood the notes when they were first issued. DSM also argues that, even if the contempt judgment was proper, the plaintiff should not have been awarded attorney's fees and costs. We reject these arguments.

A. *The injunction.* We review the judge's findings of fact and conclusions of law under the standard of review set forth in Part II of this opinion. We conclude that in all areas, fact and law, the judge's decision withstands scrutiny.

1. *Clear and unequivocal command.* DSM argues that the contempt judgment was in error because the injunction did not contain a clear and unequivocal command prohibiting DSM from distributing its retained earnings to its shareholders. To find a violation of an injunction sufficient to justify an order of contempt, there must be a "clear and unequivocal command and an equally clear and undoubted disobedience" (citation omitted). *Nickerson* v. *Dowd,* 342 Mass. 462, 464 (1961). DSM asserts that the phrase in the injunction, "ordinary course of business," is not sufficiently clear and unequivocal. We do not agree.

Civil contempt is a means of securing for the aggrieved party the benefit of the court's order. See *Godard* v. *Babson-Dow Mfg. Co.,* 319 Mass. 345, 347 (1946). It can be used as

an enforcement mechanism only if the underlying order is sufficiently clear, so that the party to be bound is provided with adequate notice of the required or prohibited activity. See *Warren Gardens Hous. Coop.* v. *Clark*, 420 Mass. 699, 701 (1995); *Gleed* v. *Noon*, 415 Mass. 498, 500 (1993); *Department of Pub. Health* v. *Cumberland Cattle Co.*, 361 Mass. 817, 831 (1972). Injunctions have been deemed ambiguous where the scope of the order has been defined by terms subject to judicial discretion. See *Warren Gardens Hous. Coop.*, *supra* ("adequate[]" supervision not clear and unequivocal notice); *Pendoley* v. *Ferreira*, 345 Mass. 309, 310, 314 (1963) (injunction referring to "unreasonable manner," "material interfere[nce]," and "reasonable enjoyment" rejected as too "generally phrased"); *Smith* v. *Atlantic Props., Inc.*, 12 Mass. App. Ct. 201, 210 (1981) ("reasonable dividend at the earliest practical date" insufficiently clear and unequivocal to justify enforcement by civil contempt proceedings). Where a court's order lacks a critical term or contains an error, a finding of civil contempt is inappropriate. See *Hinds* v. *Hinds*, 4 Mass. App. Ct. 63, 66-67 (1975); *Donnelly* v. *Glacier Sand & Stone Co.*, 2 Mass. App. Ct. 368, 369 (1974); *Schlichte* v. *Schlichte*, 2 Mass. App. Ct. 862 (1974). We have also refused to hold a defendant in contempt if, in order to do so, the scope of the underlying order would be expanded beyond its plain meaning. See *Peggy Lawton Kitchens, Inc.* v. *Hogan*, 403 Mass. 732, 734-735 (1989).

The injunction prohibited DSM from "transferring any assets to any of the other defendants or their affiliates or family members and from paying any sum to any of the other defendants or their affiliates or family members except . . . in the ordinary course of business." The only term in this order that could even be considered to be subject to judicial discretion is the term "ordinary." We accept Chief Justice Rugg's straightforward characterization of this term: "Scarcely any word has a more common and approved usage in the speech of mankind than 'ordinary.' It means the usual, common, general customary. It signifies the opposite of rare, uncommon, exceptional, extraordinary, unusual." *Higgins's Case*, 284 Mass. 345, 353 (1933) (Rugg, C.J., dissenting).[70]

DSM contends that the phrase "ordinary course of busi-

---

[70]The clarity and common sense reflected in Chief Justice Rugg's definition is not dissipated by its inclusion in a dissent to the court's opinion.

ness" is not sufficiently clear and unequivocal to form the basis for a contempt order, because activities in the "ordinary course" differ from business to business. However, where the enforcement of the underlying court order is not dependent on terms subject to judicial discretion, a mere dispute over the legal meaning of certain terms in the injunction does not render it unenforceable. We have upheld findings of contempt where the court order, although subject to some legal interpretation, has nonetheless placed the party bound by the order on notice that certain actions could constitute the basis for contempt. See *Allen* v. *School Comm. of Boston*, 400 Mass. 193, 194 (1987) (contempt proper where defendant had no reasonable basis for doubting meaning of judge's order); *Labor Relations Comm'n* v. *Boston Teachers Union, Local 66*, 374 Mass. 79, 89 (1977) (contempt appropriate where plain meaning of terms put defendants on notice that certain acts would be basis for contempt citations); *Coyne Indus. Laundry of Schenectady, Inc.* v. *Gould*, 359 Mass. 269, 275-276 (1971) (dispute over meaning of terms in restraining order insufficient to render order ambiguous); *Nickerson* v. *Dowd*, 342 Mass. 462, 464-465 (1961) ("lawful" operation of business, while confusing term, nonetheless sufficient basis for contempt proceedings). Here, the order was not ambiguous as to the proscribed activity and served to put DSM on notice that payments to other defendants or family members could subject it to citations for contempt. We conclude that, although the application of the phrase "ordinary course of business" requires some legal interpretation, the injunction was not so ambiguous a command as to be incapable of being enforced through a contempt order. See *Labor Relations Comm'n, supra.*

2. *Clear and undoubted disobedience.* In order to constitute contempt, there must be, in addition to a clear and unequivocal command, an "equally clear and undoubted disobedience." *Nickerson, supra* at 464. DSM argues that, even if the injunction was a clear and unequivocal command, the order was not violated, because the prepayment of the promissory notes represented the distribution of the balance of corporate earnings, an event that had taken place previously in DSM's history as a Subchapter S corporation, and was therefore within the ordinary course of business. We disagree.

In order to determine whether the transfer of undistributed

earnings by DSM in late 1992 was in the "ordinary course" of its business, we must adopt a benchmark against which DSM's actions can be measured. The judge found, and DSM does not dispute, that the injunction was clearly designed to preserve DSM's corporate assets pending the outcome of the ongoing litigation. As such, the prepayment of the promissory notes is analogous to similar advance payments in bankruptcy law, and the definition of "ordinary course of business," as developed in bankruptcy preference law, is therefore useful to our analysis. Under bankruptcy law, a transfer of funds will be allowed if it was made in the ordinary course of business between the debtor and the transferee. 11 U.S.C. § 547 (c) (2) (B) (1994). The purpose of this exception is to allow a business subject to the restrictions of the bankruptcy law to continue normal operations, including making payments to employees, suppliers, and others for operating expenses or credit transactions. *Matter of Ullman*, 80 B.R. 101, 102 (Bankr. S.D. Ohio 1987); *In re Vunovich*, 74 B.R. 629, 631 (Bankr. D. Kan. 1987). By contrast, a transfer of funds made outside of the normal course of business is considered a preference and is avoidable. See *In re Miniscribe Corp.*, 123 B.R. 86 (Bankr. D. Colo. 1991). The use of the term "ordinary" in bankruptcy law is meant to assure that neither a debtor nor a creditor does anything abnormal to gain an unfair advantage over other creditors. *In re Economy Milling Co.*, 37 B.R. 914, 922 (Bankr. D.S.C. 1983). A court reviewing transfers under § 547 considers the prior course of dealing between the parties, together with the amount, timing, and circumstances of any payments. *Matter of Ullman, supra* at 103. *In re Vunovich, supra.*

By a similar analysis, if DSM prepaid the promissory notes in the course of its normal, day-to-day business operations, then its action was within the ordinary course of its business and not in violation of the injunction. See *Hart* v. *Brierley*, 189 Mass. 598, 601 (1905). If, however, the payment was untimely, in an unusual form, in an unusual amount, or for a transaction that was unusual between the parties, then it was not "ordinary" and violated the restraining order imposed by the court. See *Matter of Ullman, supra* at 103, and cases cited; *In re Vunovich, supra,* and cases cited. See also *Hart, supra* at 601-602 (timing and size of transactions are factors in determination that transaction was not in ordinary course).

Whether particular transactions are made in the ordinary course of business is a question of fact. *Hart, supra* at 601.

The judge found that DSM deviated from its ordinary business practice when it paid out $68.5 million in undistributed earnings, representing three years' worth of accumulated earnings, during a ten-week period in late 1992. While the distribution of one hundred per cent of earnings had occurred previously in the history of DSM as a Subchapter S corporation, the judge found that the imposition of the injunction necessarily altered this practice because the clear purpose of the order was the preservation of corporate assets. Thus any extraordinary payment of funds, other than those ordinarily paid to the shareholders to meet their tax obligations, was in violation of the injunction. The judge further found that the size, timing, and circumstances surrounding the payment were not typical of the course of dealing between DSM and its shareholders. There was adequate evidence to support the factual findings of the judge. DSM has not met its burden of convincing us that these factual findings are clearly erroneous.[71]

Where an injunction is in effect, the party bound by the order is responsible for ascertaining whether any proposed actions are among the proscribed activities. "[I]t is not the plaintiff's obligation to police the decree but the defendant's obligation to make certain he does not violate it. Thus if the defendant saw the decree as ambiguous on the point in question, he could have sought clarification from the court before he engaged in the questionable conduct." *Coyne Indus. Laundry of Schenectady, Inc., supra* at 275. See also *Labor Relations Comm'n, supra* at 91 (parties subject to restraining order "should have assumed the initiative to make certain that their conduct did not violate the terms of the court or-

---

[71]Because we conclude that the appropriate measure of ordinary course of business is found in the pattern of activity between DSM and its shareholders, we do not address DSM's separate assertion that such payments are not unusual in the ordinary course of Subchapter S corporations generally. We do note that, while DSM may have been able to show that other Subchapter S corporations prepay promissory notes to their shareholders, thereby distributing one hundred per cent of their earnings, DSM has offered no evidence to support the contention that a Subchapter S corporations's payment of three-years' worth of undistributed earnings within a ten-week period, while operating under an injunction such as this one, is a general, customary or usual occurrence.

der[]"). If DSM, whose original letter of agreement was adopted by the court as its order, was confused as to what sort of payments could be considered "in the ordinary course of business," it could easily have sought clarification from the court before prepaying the promissory notes.[72] We conclude that the prepayment of the promissory notes was in clear and undoubted disobedience of the injunction against DSM.

B. *Laches.* The judge found that the prepayment of the shareholder notes in late 1992 constituted either a transfer of assets by DSM to the defendant shareholders or the payment of sums by DSM to the defendants outside of the ordinary course of business. DSM challenges part of this finding and argues that the transfer of assets occurred when the promissory notes were issued in December, 1991, and that the failure of the plaintiff to file suit at that time resulted in an unreasonable and prejudicial delay. The judge found that the cause of action did not accrue until the plaintiff began to receive his portion of the prepayments in October, 1992, and determined that the four-month delay between that receipt and the filing of the instant action was not an unjustified, unreasonable, or prejudicial delay. See *Srebnick* v. *Lo-Law Transit Mgt., Inc.,* 29 Mass. App. Ct. 45, 49 (1990), citing, e.g., *Stewart* v. *Finkelstone,* 206 Mass. 28, 36 (1910). A defendant must show prejudice or disadvantage to sustain a defense of laches. *Security Nat'l Bank* v. *General Motors Corp.,* 345 Mass. 434, 441 (1963). The judge found no such prejudice or disadvantage. We agree and conclude that the plaintiff's contempt action was not barred by laches.[73]

C. *Attorney's fees.* The judge awarded the plaintiff attorney's

---

[72]DSM argues that omissions or ambiguities in the order should be resolved in favor of the individual charged with contempt. See 11A C.A. Wright, A.R. Miller, & M.K. Kane, Federal Practice and Procedure § 2955, at 310 & n.9 (2d ed. 1995). As discussed above, we do not see the phrase "ordinary course of business" as ambiguous. Further, DSM drafted the letter of agreement that was adopted as the order. Ambiguous language in an agreement is to be construed against the drafter of the agreement. *Massachusetts Turnpike Auth.* v. *Perini Corp.,* 349 Mass. 448, 454 (1965).

[73]We would reach the same conclusion even if the issuance of the promissory notes was determined to be a triggering event. The delay of thirteen months between the issuance of the last promissory note and the institution of the suit was not prejudicial to the defendant. Further, even if a transfer of assets occurred at the time that the notes were issued, the injunction was violated anew upon the "pay[ment] of [a] sum" to the defendants without proper notice when the promissory notes were prepaid in late 1992.

fees and costs.[74] As matter of law, the awarding of attorney's fees and costs is an appropriate element of a successful civil contempt proceeding. See *Coyne Indus. Laundry of Schenectady, Inc., supra* at 277; *Lyon* v. *Bloomfield*, 355 Mass. 738, 745 (1969); *Giannetti* v. *Thomas*, 32 Mass. App. Ct. 960, 961 (1992). The purpose of civil contempt proceedings is remedial. *United Factory Outlet, Inc.* v. *Jay's Stores, Inc.*, 361 Mass. 35, 37 (1972), quoting *McComb* v. *Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949). Attorney's fees and costs in a contempt proceeding are the court's means of compensating the plaintiff for legal expenses and costs incurred as a consequence of the defendant's violation of the court order. *Giannetti, supra*. This award is proper regardless of whether the court has considered the violation of the underlying order to be wilful, and it is within the court's discretion to formulate a remedy in a civil contempt proceeding. *Grunberg* v. *Louison*, 343 Mass. 729, 736 (1962). *Godard* v. *Babson-Dow Mfg. Co.*, 319 Mass. 345, 347, 349-50 (1946). *Giannetti, supra.*

DSM challenges the award of attorney's fees and costs on a number of bases, including the failure of the judge to find that the violation of the injunction was wilful or to assess any fines, and DSM's contentions that the plaintiff did not suffer any damages from the violation and that the injunction was ambiguous. All of these arguments are unpersuasive under the cases cited above. DSM's final argument, that the plaintiff is not entitled to attorney's fees and costs because he was not the prevailing party on all counts, must fail as well. While there originally were three counts in the contempt complaint, only one judgment was rendered, and it was in favor of the plaintiff.[75] "Where but one judgment is rendered in the action the prevailing party is the one in whose favor that judgment is entered." *Smith* v. *Wenz*, 187 Mass. 421, 425 (1905). The judge's award of attorney's fees and costs to the plaintiff was proper.

## VIII. DISPOSITION.

The shareholder derivative action is remanded to the

---

[74]According to the record before us, the judge has not yet fixed the amount of fees and costs to be awarded to the plaintiff.

[75]Counts II and III of the original contempt complaint were dismissed because the judge found that the order upon which these claims were based had expired prior to the defendant's acts.

Superior Court for such further proceedings as may be necessary in order to calculate credits that may be due to any of the defendants for investments and tax payments as more specifically described in Part VI of this opinion. Thereafter, an appropriate supplemental judgment is to be entered which establishes any credits found by the judge, dismisses D. Harold Sullivan from the action, and removes the requirement that Sullivan reimburse DSM and Valley for his attorney's fees and costs. The existing amended judgment is to stand beside the supplemental judgment for purposes of ultimate enforcement of the relief granted in the shareholder derivative action. The judgment in the contempt action, including its award of attorney's fees and costs, is affirmed.

*So ordered.*